05-473

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 465

BRUCE BUHMANN, SHIRLEY BUHMANN, CIRCLE EAGLE GAME FARM,
LEN WALLACE, PAMELA WALLACE, and BIG VELVET RANCH,

      Plaintiffs and Appellants,

  v.

STATE OF MONTANA, MIKE McGRATH, and JEFF HAGENER,

      Defendants and Appellees,

SPORTSMEN FOR I-143, MONTANA WILDLIFE FEDERATION,

      Defendant-Intervenors and Appellees.

APPEAL FROM:    District Court of the First Judicial District,
                In and For the County of Lewis and Clark, Cause No. ADV 2002-555
                Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Arthur V. Wittich (argued), Wittich Law Firm, P.C., Bozeman, Montana

            Richard M. Stephens (argued), Groen, Stephens & Klinge, LLP,
            Bellevue, Washington

      For Appellees:

            Hon. Mike McGrath, Montana Attorney General, Chris D. Tweeten,
            (argued), Assistant Attorney General, Helena, Montana

      For Defendant-Intervenors and Appellees:

            Jack R. Tuholske (argued), Tuholske Law Office, P.C.,
            Missoula, Montana

            Sarah K. McMillan, Attorney at Law, Missoula, Montana

Argued: September 13, 2006
Submitted: June 20, 2007
Decided: December 31, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Bruce and Shirley Buhmann (Buhmanns), owners and operators of the Circle Eagle Game Farm, and Len and Pamela Wallace (Wallaces), owners and operators of the Big Velvet Ranch, appeal an order of the First Judicial District Court which denied their takings claims under the Fifth Amendment to the U.S. Constitution and Article II, Section 29 of the Montana Constitution.   These claims alleged that the enactment and enforcement of initiative measure no. 143 (I-143), which was approved by the citizens of Montana on November 7, 2000, constituted a taking of their private property and that they were entitled to just compensation for this taking.  For the reasons set forth below, we affirm the District Court.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2    The case at bar involves takings claims very similar to claims we recently addressed in *Kafka v. Mont. Dept. of Fish, Wildlife and Parks*, 2008 MT 460, ___ Mont. ___, ___ P.3d ___.   Insofar as the background information and our decision and reasoning in *Kafka* applies to the case at bar, we will refer to that case.  Where the arguments and issues raised by the present appellants are distinct from those raised by the parties in *Kafka*, we will address their merits accordingly.

¶3    The appellants in this case were owners and operators of alternative livestock game farms (Game Farms) within the state of Montana.  The Game Farm industry is premised on the notion that individuals are willing to pay significant amounts of money to shoot captive animals, primarily elk, within the confines of a Game Farm.  Since 1917, it has been lawful for individuals to own alternative livestock, such as elk, and keep them

3

in captivity. Game Farms are heavily regulated by the Montana Department of Fish, Wildlife, and Parks (FWP) because of the threat posed by chronic wasting disease (CWD), a fatal disease of the central nervous system of captive and free-ranging animals such as mule deer, white-tailed deer, and Rocky Mountain elk. *Kafka*, ¶ 2. To operate a Game Farm, the owner/operator must possess an alternative Game Farm license and comply with the rigorous and extensive licensing requirements set forth in Title 87, chapter 4, part 4, MCA. *See Kafka*, ¶¶ 2, 8.

¶4 On November 7, 2000, the voters of Montana passed I-143, which made two significant changes to the regulation of Game Farms in Montana. *See Kafka*, ¶¶ 6-9. First, it prohibited fee-shooting on Game Farms in Montana. Second, I-143 prohibited licensees from transferring their alternative livestock licenses to others. These changes had a significant impact on the Game Farm industry in Montana because the vitality of the Game Farm industry was premised upon the profits derived from fee-shooting. The ban on the transfer of licenses was significant because it essentially prohibited Game Farm owners from selling those Game Farms to others, since a Game Farm could not operate without a valid license. I-143 did not, however, eliminate all uses of alternative livestock as it still permitted Game Farm operators to own herds, harvest the animals for their meat or antlers, or sell them in out-of-state markets where fee-shooting was legal. *Kafka*, ¶¶ 7-8.

¶5 The enactment and enforcement of I-143 led to several lawsuits in both state and federal court in Montana. At the time of this suit, the Buhmanns resided in Blaine County, Montana, and owned and operated the Circle Eagle Game Farm, a twenty-nine

4

acre game farm which was regulated by FWP. The Buhmanns began the Circle Eagle Ranch in 1997 after applying for and receiving a loan from the state of Montana's Department of Commerce. The Buhmanns' loan application included a business plan describing an elk-breeding program they planned to institute. This plan included the annual selling of wholesale mature bulls to shooting operations, and the selling of retail mature cows to other breeding operations. The Buhmanns and the Circle Eagle Ranch received an alternative livestock license through FWP which allowed them to keep sixty elk. They began selling elk in 1999. In addition to selling elk, the Buhmanns also sold a mineral supplement for captive deer and elk called Sweet Pro.

¶6 The Wallaces started the Big Velvet Ranch in Ravalli County, Montana, after obtaining a Game Farm license in 1992. The Big Velvet Ranch eventually encompassed roughly 2000 acres. In the course of developing their ranch, the Wallaces purchased material for fencing and other infrastructure, constructed a lodge on the property, removed the native deer and elk, and then imported alternative livestock (elk) from other locations. The Wallaces raised captive elk, and provided opportunities for the fee-shooting of elk on the Big Velvet Ranch. Under this service, clients would come and stay on the Big Velvet Ranch and be guaranteed to shoot an elk within the confines of the ranch. Additionally, the Wallaces bred captive elk for other Game Farms.

¶7 According to the factual assertions in their complaint, the Wallaces invested millions of dollars in developing the Big Velvet Ranch, and took a number of measures to ensure that their alternative livestock was of the highest quality and was disease-free. In 1999, after a three-year testing process, the Big Velvet Ranch was certified as

5

tuberculosis-free, and in 2001 certified as brucellosis-free. Additionally, the Wallaces tested roughly 700 animals from the Big Velvet Ranch for CWD, and all those tests came back negative. The Wallaces also claim they developed prototype feed trucks, and appropriate facility modifications which would allow them to maintain a high nutritional level of the elk, at a cost of over $600,000. The Wallaces further stated that they took other measures, including the hiring of a veterinarian and the development of extensive monitoring systems, to ensure that their operation established a reputation as one of the most successful private elk ranches in the United States.

¶8 From 1997 through 1999, the Wallaces claim to have harvested over 100 mature bulls and earned gross revenues of over $1 million per year. The Wallaces allege that their ranch guests would pay on average $7,000 for hunting mature bull elk, and that this comprised the majority of the ranch's revenues. Between 1995 and 2000, the Wallaces hosted more than 600 clients.

¶9 After the passage of I-143, and its interpretation by the Attorney General's office and FWP, the Wallaces claim that their existing and prospective customers cancelled their plans to visit the Big Velvet Ranch, and that many demanded refunds on their deposits. Similarly, there was a cancellation of promised purchases of animals and feed from the Circle Eagle Ranch. The Wallaces claim that in order to stem the financial hemorrhaging at the ranch, they contacted various Indian tribes in Montana to assess their interest in receiving approximately 500 animals from the Big Velvet Ranch. After obtaining the appropriate permits, the Wallaces thereafter entered into an agreement with the Crow Indian Tribe to transfer some of their animals. After the first shipment of 67

elk, the Wallaces were enjoined in the First Judicial District Court from transferring any more of their alternative livestock to the Crow Indian Reservation to be released in an unfenced area. The Wallaces appealed the issuance of this injunction to this Court, and it was upheld in *Hagener v. Wallace*, 2002 MT 109, 309 Mont. 473, 47 P.3d 847. The Wallaces also sought injunctions against the enforcement of I-143 in Ravalli County District Court, as well as separately in the federal district of Montana, both of which were denied. Moreover, Len Wallace was tried and convicted in Justice Court for violating I-143's ban on fee-shooting.

¶10    On June 6, 2002, the Wallaces and Buhmanns filed a joint action against the state of Montana, Attorney General Mike McGrath, and FWP Director Jeff Hagener in the Seventeenth Judicial District Court, Blaine County, seeking damages for the taking of their private property under the Fifth Amendment and Article II, Section 29 of the Montana Constitution. The Wallaces and Buhmanns alleged that I-143 violated the Fifth Amendment's prohibition on the taking of private property without just compensation, as well as Article II, Section 29's prohibition on a damaging of their property. The Wallaces and Buhmanns alleged that I-143 affected a taking of their private property rights without just compensation "by specifically taking the only viable source of profitability (i.e., shooting animals for a fee), and thereby destroying the Montana breed stock sale market, and prohibiting the transfer of licenses." The Wallaces and Buhmanns alleged that the State enforced I-143 to the detriment of their property rights and that this enforcement imposed new retroactive liabilities on them, damaging their vested property rights as well. Additionally, the Wallaces and Buhmanns alleged that by prohibiting the

7

transfer of their licenses and the value of their investments in their Game Farms to others, the State took not only their "property rights and licenses, but also the profitable use of the land, and the increased value of the land as a result of the prior issued licenses." The Buhmanns and Wallaces also alleged that McGrath and Hagener violated their constitutional rights by enforcing I-143 against them, and brought a claim for relief under 42 U.S.C. § 1983.[1]

¶11 The precise nature of the Buhmanns' and Wallaces' claims differed slightly. Because the Buhmanns did not provide fee-shooting services, their business operations were not directly affected by I-143. However, by eliminating the in-state market for fee-shooting, I-143 had a significant economic impact on the profitability of their breeder operation and their marketing of Sweet Pro. The Wallaces, on the other hand, were directly affected since the Big Velvet Ranch provided fee-shooting services.

¶12 On July 22, 2002, the State filed a motion to change the venue of the case from Blaine County to the First Judicial District, Lewis and Clark County, pursuant to § 25-2-116, MCA. On August 16, 2002, the Wallaces and Buhmanns filed a motion to sever the parties, pursuant to M. R. Civ. P. 21. In the motion, the Buhmanns argued that their action should remain in Blaine County, while the Wallaces argued that they should be able to pursue their cause of action in Ravalli County under a complaint they filed there on August 6, 2002. On August 28, 2002, the Blaine County District Court denied

---

[1] At the close of appellants' case-in-chief, the District Court granted the State's motion to dismiss the § 1983 claim for failure to proof. Appellants did not object at the time, and do not challenge the dismissal of this claim on appeal.

the motion to sever and granted the State's motion to change the venue of the case to Lewis and Clark County.

¶13 On September 17, 2002, the First Judicial District Court, Judge Dorothy McCarter presiding, assumed jurisdiction over the appellants' suit. On October 10, 2002, the District Court granted a motion filed by appellees Sportsmen for I-143 and Montana Wildlife Federation to intervene in this matter. Initially, the District Court set a jury trial to hear appellants' claims. However, the State subsequently filed a motion to bifurcate the proceedings, arguing that the issue of whether the State was liable for a taking should be decided solely by the District Court. If the State was found liable, then the issue of damages would be submitted to a jury. The appellants resisted the State's motion, asserting that they were entitled to a jury trial on the issue of takings liability.

¶14 The State also filed a motion seeking summary judgment on appellants' takings claims. One aspect of the State's motion dealt with the issue of whether appellants could assert a categorical takings claim with respect to their personal property (e.g., alternative livestock, and Game Farm equipment). The State argued that under the authority of *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886 (1992), a categorical taking claim may be asserted only for claims regarding a taking of land, and not for a taking of personal property or other property interests. *See Kafka*, ¶¶ 67-69 (noting the distinction between categorical and regulatory takings claims). Since the appellants' land all retained significant value in spite of the passage of I-143, a categorical taking claim would fail in this case. Additionally, the State argued that it was further entitled to summary judgment on appellants' regulatory takings claims.

9

¶15    After holding a hearing on these motions on October 6, 2004, the District Court granted a portion of the State's motion, concluding that the question of whether there had been a taking presented a question of law to be determined by the District Court without a jury. If a taking was found by the District Court, it would submit the issue of damages to a jury. Additionally, while the District Court ultimately denied the State's summary judgment motion and concluded that it would hold a bench trial on appellants' takings claims, it agreed with the State that under *Lucas*, personal property could not form the basis for a categorical takings claim. Moreover, the District Court agreed with a legal argument raised in the State's brief that the same analysis, based on federal law, applied to takings claim, whether brought under Article II, Section 29 of the Montana Constitution or the Fifth Amendment to the U. S. Constitution.

¶16    Beginning on November 30, 2004, the District Court held a three-day bench trial on appellants' takings claims. The District Court heard testimony from Bruce Buhmann, Len Wallace, Dr. Peter Nickerson (Dr. Nickerson), an economist and expert witness for appellants, as well as other witnesses for both parties. The District Court also received a number of exhibits into evidence. Based on this evidence and testimony, the District Court made a number of factual findings with respect to the Wallaces' and Buhmanns' operations and property interests.[2]

---

[2]    In this connection, we note that much of the analysis by the District Court and argument by the parties during the bench trial, focused on the purposes and objectives of I-143, and whether it accomplished the goals of preventing outbreaks of CWD, preserving Montana's "fair chase" hunting heritage, and preventing the privatization or commercialization of wildlife. However, as we observed in *Kafka*, recent United States Supreme Court jurisprudence has foreclosed an inquiry into the efficacy or purposes of a

10

¶17     With respect to the Wallaces, the District Court found that they had complied with the licensing requirements set forth by FWP in the operation of the Big Velvet Ranch. The District Court noted that as the Wallaces sought to expand their operation over the years, they had applied with FWP for the necessary expansion permits. In 1997, the Wallaces were denied an expansion request by FWP which would have added approximately 1000 acres to the then-existing roughly 2000 acre ranch. After this denial, the Wallaces decided to sell their property out of a concern that they would not have enough grazing land for their elk. They subsequently acquired a Game Farm in Wisconsin to provide grazing land for their animals, but were prevented from shipping the animals back and forth due to outbreaks of CWD on Game Farms in several states, including Montana. Additionally, the District Court found that prior to I-143, the Wallaces had difficulty marketing their elk outside of Montana because of a moratorium on interstate elk shipments from Montana as a result of a CWD outbreak on a Montana Game Farm in 1997. The District Court further found that an outbreak of CWD on another Game Farm impacted the ability of the Wallaces to sell their property and that it was still on the market at the time I-143 went into effect.

¶18     The District Court found that after the passage of I-143, the Wallaces began selling off their elk and Game Farm equipment at a "substantial loss" compared with their pre-I-143 value. Between 1997 and 1999, the Wallaces spent approximately $666,166 to

regulatory change (which are best considered as "due process" concerns) in the realm of regulatory or categorical takings analysis. *See Kafka*, ¶¶ 70-71 (discussing *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 125 S. Ct. 2074 (2005)). In other words, for purposes of the takings analysis in this case, it is immaterial whether or not I-143 is effective in achieving any of the objectives or concerns it was designed to address.

purchase elk. Len Wallace testified that the value of his elk herd prior to I-143 was roughly $5.5 million. After I-143, he liquidated the herd for approximately $238,000, and in some cases simply donated his elk to various organizations. Additionally, the Wallaces sold some of their specialized equipment, which cost approximately $600,000 to purchase, for $150,000. The District Court found that the net income from the Big Velvet Ranch for the four-year period prior to I-143 was $1,480,452. Financial records prepared by Dr. Nickerson demonstrated that the Wallaces had a basis of $4,595,123 in their business. Between 1994 and 2003, the records indicated numerous sales of parcels of land ranging between ten and forty acres, totaling more than $1 million dollars, as well as two sales of property to another ranch for more than $5 million dollars.

¶19 In total, the District Court concluded that the Wallaces suffered a significant, but not complete, loss of value to their Game Farm business as a result of I-143. The District Court quantified this loss as a fifty percent reduction in the value of their business. This figure apparently took into account the fact that while the Wallaces' elk suffered a significant devaluation, the real estate associated with the Big Velvet Ranch had in fact appreciated. The District Court further found that while the market for alternative livestock elk had declined, alternative livestock could still be bred and sold to Game Farms in other states.

¶20 With respect to the Buhmanns, the District Court found that when they initially purchased the land on which the Circle Eagle Game Farm is located in the mid-1980's, they had no intention of operating a Game Farm but chose that course much later. The District Court found that the Buhmanns purchased all of their elk in 1997 for $29,500,

and began selling them in 1999. Their total sales receipts through 2000 were $8,948, and they received $11,963 from elk sales in 2001 and 2002. They anticipated selling approximately 10 calves a year for about $30,000. With respect to their sales of Sweet Pro, the District Court found they had gross sales for this product of approximately $68,000 between 2000 and 2002. For the overall period of their business from 1997 to 2002, they had a net business loss of $41,325. With respect to the impact on their business from I-143, the District Court found that no aspect of that business was prohibited because they did not operate a fee-shooting operation. However, I-143 did affect the market for both their alternative livestock and Sweet Pro. The District Court concluded that the Buhmanns suffered a net loss of $22,000 as a result of I-143.

¶21 In its conclusions of law, the District Court began by restating its determination that the same legal analysis, based upon federal law, applied to claims whether brought under the Fifth Amendment or Article II, Section 29. Moreover, the District Court stated that a categorical takings claim did not lie in this case under *Lucas* because categorical takings apply only to takings of land. The District Court then went on to reject appellants' claims for a regulatory taking under the analytical framework set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646 (1978). *See Kafka*, ¶¶ 67-73 (discussing *Penn Central* regulatory takings analysis). The reasoning and analysis of the District Court will be discussed in greater detail below.

¶22 The Wallaces and Buhmanns now appeal the denial of their takings claims by the District Court. They present the following issues on appeal:

¶23   **Issue One:** *Did the District Court err in changing the venue of the proceedings to Lewis and Clark County and denying appellants' motion to sever the Wallaces' claims?*

¶24   **Issue Two:** *Did the District Court err in concluding that liability for appellants' takings claims would be decided by the court instead of a jury?*

¶25   **Issue Three:** *Did the District Court err in concluding that Article II, Section 29 of the Montana Constitution does not provide any greater constitutional protection against the taking of private property than the Fifth Amendment to the U. S. Constitution, and that the same legal analysis applies to takings claims brought under the Fifth Amendment to the U. S. Constitution and Article II, Section 29 of the Montana Constitution?*

¶26   **Issue Four:** *Did the District Court err in denying appellants' claim that I-143 affected a categorical taking of their personal property?*

¶27   **Issue Five:** *Did the District Court err in concluding that I-143 did not affect a regulatory taking of appellants' private property?*

## STANDARD OF REVIEW

¶28   We review a district court's findings of fact under the clearly erroneous standard, and its conclusions of law for correctness. *Roe Family, L.L.C. v. Lincoln Co. Bd. of Commsrs.*, 2008 MT 70, ¶ 12, 342 Mont. 108, ¶ 12, 179 P.3d 514, ¶ 12. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been committed. *Roe Family*, ¶ 12.

## DISCUSSION

14

¶29 **Issue One:** *Did the District Court err in changing the venue of the proceedings to Lewis and Clark County and denying appellants' motion to sever the Wallaces' claims?*

¶30 The Seventeenth Judicial District Court, Blaine County, granted the State's motion to transfer the case to Lewis and Clark County where the merits of appellants' takings claims were ultimately decided. The appellants argue that the District Court erred in granting the change of venue. In its order, the Blaine County District Court found that a change of venue was proper under § 25-2-116, MCA, which reads as follows:

> **25-2-116. Multiple claims.** In an action involving two or more claims for which this part designates more than one as a proper place of trial, a party entitled to a change of place of trial on any claim is entitled to a change of place of trial on the entire action, subject to the power of the court to separate claims or issues for trial under Rule 42(b) of the Montana Rules of Civil Procedure.

¶31 Although the Wallaces' and Buhmanns' complaint asserted only two counts, the District Court determined that they asserted more than two claims for purposes of the statute because the specific allegations and relief sought by the Buhmanns was sufficiently distinct from the specific allegations and relief sought by the Wallaces. The District Court observed that it is the nature of the rights asserted and demand for relief sought that determines the number of claims, rather than a formal designation in the complaint itself. The District Court noted that the Wallaces and Buhmanns each detailed different locations and businesses which were differently affected by I-143, and that the damages in each case differed based not only on these different locations but also on the duration of the effect, the type of the business, and the extent of the respective parties' investments.

15

¶32 The District Court also noted that because their claims were brought against the state of Montana, the proper venue for the claims, pursuant to § 25-2-126, MCA, would be either the county of the plaintiffs' respective residences or Lewis and Clark County. That statute reads in pertinent part as follows:

> The proper place of trial for an action against the state is in the county in which the claim arose or in Lewis and Clark County. In an action brought by a resident of the state, the county of the plaintiff's residence is also a proper place of trial.

Section 25-2-126(1), MCA.

¶33 Here, the parties resided in different counties. The Buhmanns resided in Blaine County, while the Wallaces resided in Ravalli County. Therefore, while Blaine County would be a proper venue under the statute for the Buhmanns, it would not be proper for the Wallaces. Thus, under § 25-2-126(1), MCA, Lewis and Clark County would be the only appropriate venue for all parties. Since the State was entitled to a change of venue under § 25-2-116, MCA, by virtue of the presence of multiple claims, the Blaine County District Court concluded that a change of venue to Lewis and Clark County was appropriate.

¶34 Additionally, the District Court denied a motion filed by the appellants to keep the Buhmanns' claims in Blaine County, and allow the Wallaces to sever their claims and pursue a newly-filed complaint in Ravalli County. On the one hand, the District Court concluded that the Buhmanns had failed to show good cause under M. R. Civ. P. 42(b), to separate the claims, and further failed to demonstrate how their access to court in Lewis and Clark County would be impractical or expensive. With respect to the Wallaces'

16

motion to sever, the District Court denied that motion under the authority of *Emery v. Federated Foods, Inc.*, 262 Mont. 83, 863 P.2d 426 (1993), for the simple reason that the motion to sever had yet not been filed at the time the State filed its motion for change of venue.

¶35 On appeal, the Wallaces and Buhmanns maintain the District Court erred in its application and interpretation of these statutes, and assert that they simply do not cover scenarios involving multiple plaintiffs. They maintain that the District Court's interpretation unfairly deprives them of their right to choose venue. They argue that the intent of these statutes is to prevent plaintiffs from adding spurious claims to prevent defendants from obtaining a favorable venue, a concern not present in this case.

¶36 With respect to the denial of the motion to sever, the appellants argue that the District Court's decision not to consider the motion due to its timing directly contravenes the holdings in both *DML, Inc. v. Fulbright*, 2005 MT 204, 328 Mont. 212, 119 P.3d 93, and *Emery*. Appellants argue that the doctrine that propriety of venue is determined as of time of the complaint, applies only in situations where the composition of the parties changes, and was not intended to freeze in time all activities occurring in a case— including the motion to sever which was filed here. Accordingly, they argue that the motion to sever should have been considered and granted by the District Court.

¶37 The State maintains that *DML* controls and demonstrates that the District Court correctly permitted a change of venue to Lewis and Clark County. With respect to the motion to sever, the State points out that the decision of whether to sever claims lies within the District Court's discretion under § 25-2-116, MCA, and M. R. Civ. P. 42(b), in

17

furtherance of convenience and to avoid prejudice. Here, the District Court explicitly found that the appellants failed to make a showing justifying the invocation of M. R. Civ. P. 42(b). The State asserts that appellants have not challenged this finding on appeal.

¶38 "The determination of whether a county is the proper place for trial is a question of law involving the application of the venue statutes to pleaded facts." *DML*, ¶ 7. Our review of such decisions is plenary, meaning we determine whether the district court's ruling was legally correct. *DML*, ¶ 7. We conclude that the Blaine County District Court did not err in permitting the State to change the venue of appellants' cause of action to Lewis and Clark County.

¶39 In *DML*, this Court interpreted § 25-2-116, MCA, as follows:

> By the words of § 25-2-116, MCA, "a party entitled to a change of place of trial on any claim is entitled to a change of place of trial on the entire action." This statute contemplates a multiple claim situation in which the county where the plaintiff files is proper for one claim but not for one or more of the others. As recognized by the Evidence Commission Comments to § 25-2-116, MCA, this Court has ruled consistently that a defendant entitled to a change of venue on one claim should have it on the entire action.

*DML*, ¶ 16.

¶40 Here, it is patent that venue in Lewis and Clark is proper with respect to the Buhmanns' claims by virtue of § 25-2-126(1), MCA. Because the Wallaces reside in Ravalli County, venue is appropriate there, or in Lewis and Clark County. Under *DML*, therefore, the State is entitled to a change of venue with respect to the entire action. *See DML*, ¶ 27 (Gray, C.J., concurring) (concluding that change of venue is appropriate under

§ 25-2-116, MCA, when action consists of multiple claims, venue statutes designate more than one county for one or more claims, and action is brought in a county which is proper for one, but not all, of those claims). Since Lewis and Clark County is an appropriate venue for all parties in this case, the District Court did not err in allowing the change of venue.

¶41 With respect to the Blaine County District Court's refusal to consider the motion to sever, we agree with the State that the District Court acted within its discretion in denying such motion. Decisions as to trial administration matters, such as a motion to bifurcate or sever, are within the "broad discretion" of the district court. *Jarvenpaa v. Glacier Elec. Cooperative, Inc.*, 1998 MT 306, ¶ 12, 292 Mont. 118, ¶ 12, 970 P.2d 84, ¶ 12. In this case, regardless of whether the District Court could or should have considered the merits of the motion to sever, it stated clearly in its order that appellants had failed to demonstrate good cause to sever, as required under M. R. Civ. P. 42(b). Appellants do not challenge this finding. Thus, we affirm the Blaine County District Court's decisions as to venue and severance.

¶42 **Issue Two:** *Did the District Court err in concluding that liability for appellants' takings claims would be decided by the court instead of a jury?*

¶43 In its October 22, 2004 Decision and Order, the Lewis and Clark County District Court granted a motion filed by the State to bifurcate the liability and damages phases of these proceedings, allowing the former to be determined solely by the District Court, while the latter would be heard by a jury if the District Court determined the State was liable for an uncompensated taking. The District Court concluded that the question of

19

whether there was a taking is a question of law, and that a property owner's right to a jury trial was limited to the issue of damages.

¶44 The District Court determined that its position was consistent with *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 119 S. Ct. 1624 (1999)— a case relied upon by appellants for their argument that they were entitled to a jury trial on the issue of takings liability. The District Court considered whether the issues of damages and liability were intertwined, or were distinct and should be presented separately, and concluded there was no practical reason to subject jurors to evidence unrelated to the issue of damages. Additionally, the District Court determined that it needed adequate time to consider liability before proceeding with a trial on damages—an exercise that would be moot if liability was decided in favor of the State.

¶45 Appellants maintain that the District Court erred and wrongfully denied them their right to a jury trial on the issue of takings liability. Citing to *Howard v. State*, 198 Mont. 470, 647 P.2d 828 (1982) and *Butte Country Club v. Metro. Sanitary and Storm Sewer Dist. No. 1*, 164 Mont. 74, 519 P.2d 408 (1974), appellants maintain that individuals asserting inverse condemnation claims have historically been entitled to jury trials. Citing to *Matter of C.L.A.*, 211 Mont. 393, 685 P.2d 931 (1984), they further argue that under Article II, Section 26 of Montana Constitution, their fundamental right to a trial by jury is guaranteed as to all class of cases in which the right was enjoyed when the Montana Constitution was adopted in 1889. Appellants argue that this class of cases extends beyond those common-law actions recognized in 1889, and includes modern-day

actions that involve rights and remedies of the sort traditionally enforced in an "action at law," such as the takings claims they presented here.

¶46 Under the authority of *Del Monte Dunes*, appellants argue that their suit for an uncompensated taking of their property is an action at law, and that the reasoning in *Del Monte Dunes* is supported by Montana cases, including *Solberg v. Sunburst Oil & Gas Co.*, 70 Mont. 177, 225 P.2d 612 (1924) and *Chessman v. Hale*, 31 Mont. 577, 79 P. 254 (1905). *See Del Monte Dunes*, 526 U.S. at 709-10, 119 S. Ct. at 1638 (action sounding in tort and seeking legal relief is an action at law); *see also Little v Little*, 127 Mont. 152, 155-56, 259 P.2d 343, 344 (1953) (actions at law include actions to recover specific personal property with damages). Appellants maintain that the *Lucas* and *Penn Central* tests for analyzing takings claims are factual inquiries which are properly allocated to a jury. They therefore argue that the District Court erred in concluding that the determination as to whether a taking has occurred is a question of law, and maintain instead that it is a question of fact.

¶47 The State maintains that because there is no established tradition of trials by jury in regulatory takings cases in Montana, this Court decides this issue on a "clean slate." The State then asserts that appellants' reliance on *Del Monte Dunes* is misplaced because that case involved solely the question of whether a plaintiff was entitled to a jury trial under the Seventh Amendment to the United States Constitution for an action brought under 42 U.S.C. § 1983. The State maintains that *Del Monte Dunes* did not address the question of whether plaintiffs are generally entitled to a jury trial on the issue of liability in takings cases. The State notes that other jurisdictions, such as California, have

21

generally held that the issue of liability in a takings claim is a question of law for the court, with a right to a jury trial available on the issue of damages. Accordingly, the State urges affirmance of the District Court on the grounds that the question of whether a taking has occurred is primarily a legal question to which no right to jury trial exists.

¶48    Whether an individual is entitled to a jury trial presents a question of law which we review de novo for correctness. *Supola v. Mont. Dept. of Justice, Drivers License Bureau*, 278 Mont. 421, 423, 925 P.2d 480, 481 (1996). As an initial matter, we agree with the State that the question before the Court is one of first impression in the state of Montana. Appellants are correct in observing that in both *Howard* and *Butte Country Club*, the trial courts apparently afforded claimants jury trials in inverse condemnation cases. *See Howard*, 198 Mont. at 472, 647 P.2d at 829; *Butte Country Club*, 164 Mont. at 76, 519 P.2d at 409. However, neither case provides any analysis or discussion which would bear on the issue of whether appellants' categorical and regulatory takings claims should be submitted to a jury, and neither case has ever been cited as authority on this point of law.

¶49    We therefore turn to *Del Monte Dunes*, upon which the State and the appellants rely for their opposite positions. In that case, a property owner (Del Monte Dunes) brought an action against the city of Monterey under 42 U.S.C. § 1983 based on its repeated denial of Del Monte Dunes' request for a development permit. Each time Del Monte Dunes submitted a development request, the city of Monterey denied it and imposed more rigorous demands on Del Monte Dunes. *Del Monte Dunes*, 526 U.S. at 694, 119 S. Ct. at 1631. Eventually, Del Monte Dunes appealed these denials to the city

22

council, and was again denied. Del Monte Dunes consequently filed a suit in federal district court alleging, among other things, that the denial amounted to an uncompensated taking under the Fifth Amendment. *Del Monte Dunes*, 526 U.S. at 698, 119 S. Ct. at 1633. The takings claims in that case were ultimately submitted to a jury, which returned a verdict in favor of Del Monte Dunes. *Del Monte Dunes*, 526 U.S. at 701, 119 S. Ct. at 1634. The question of whether the takings claim was properly submitted to the jury was later affirmed by the Ninth Circuit. The Ninth Circuit's decision was subsequently appealed to the United States Supreme Court.

¶50 One of the issues considered by the *Del Monte Dunes* court was whether it was proper for the district court to submit the question of liability for takings to the jury, instead of having the issue decided by the district court without the aid of a jury. *Del Monte Dunes*, 526 U.S. at 707, 119 S. Ct. at 1637. Del Monte Dunes asserted that its right to a jury trial was conferred by the Seventh Amendment and 42 U.S.C. § 1983, and the United States Supreme Court agreed. *Del Monte Dunes*, 526 U.S. at 710-12, 119 S. Ct. at 1638-40. In its reasoning, the *Del Monte Dunes* court explained that because an action under § 1983 sounds primarily in tort, it was of a type of action cognizable under the common law, and thus a cause of action for which the Seventh Amendment provides a trial by jury. *Del Monte Dunes*, 526 U.S. at 709-10, 119 S. Ct. at 1638.

¶51 In reaching this conclusion, the United States Supreme Court explicitly rebuffed an argument advanced by the city of Monterey that there was no common law right to a jury in eminent domain proceedings. In doing so, the Supreme Court highlighted the fact

23

that the tortious nature of a § 1983 claim was wholly independent from the nature of underlying right giving rise to the § 1983 claim itself.

> As Justice SCALIA notes . . . we have declined in other contexts to classify § 1983 actions based on the nature of the underlying right asserted, and the city provides no persuasive justification for adopting a different rule for Seventh Amendment purposes. Even when analyzed not as a § 1983 action *simpliciter*, however, but as a § 1983 action seeking redress for an uncompensated taking, Del Monte Dunes' suit remains an action at law.
>
> Although condemnation proceedings spring from the same Fifth Amendment right to compensation which, as incorporated by the Fourteenth Amendment, is applicable here, a condemnation action differs in important respects from a § 1983 action to redress an uncompensated taking.

*Del Monte Dunes*, 526 U.S. at 711-12, 119 S. Ct. at 1639 (citations omitted).

¶52    The Supreme Court explained this point further as follows:

> Condemnation proceedings differ from the instant cause of action in another fundamental respect as well. When the government condemns property for public use, it provides the landowner a forum for seeking just compensation, as is required by the Constitution. If the condemnation proceedings do not, in fact, deny the landowner just compensation, the government's actions are neither unconstitutional nor unlawful. Even when the government takes property without initiating condemnation proceedings, there is no constitutional violation unless or until the state fails to provide an adequate post deprivation remedy for the property loss. In this case, however, Del Monte Dunes was denied not only its property but also just compensation or even an adequate forum for seeking it. That is the gravamen of the § 1983 claim.

*Del Monte Dunes*, 526 U.S. at 714-15, 119 S. Ct. at 1641 (quotations and citations omitted).

¶53    In conclusion, the Supreme Court then clarified the scope of its holding with the following admonition:

24

> We note the limitations of our Seventh Amendment holding. **We do not address the jury's role in an ordinary inverse condemnation suit.** The action here was brought under § 1983, a context in which the jury's role in vindicating constitutional rights has long been recognized by the federal courts. A federal court, moreover, cannot entertain a takings claim under § 1983 unless or until the complaining landowner has been denied an adequate post deprivation remedy. Even the State of California, where this suit arose, now provides a facially adequate procedure for obtaining just compensation for temporary takings such as this one. Our decision is also circumscribed in its conceptual reach. The posture of the case does not present an appropriate occasion to define with precision the elements of a temporary regulatory takings claim; although the city objected to submitting issues of liability to the jury at all, it approved the instructions that were submitted to the jury and therefore has no basis to challenge them.

*Del Monte Dunes*, 526 U.S. at 721-22, 119 S. Ct. at 1644 (emphasis added).

¶54    The *Del Monte Dunes* Court thus took great pains to expressly limit its holding to actions brought under § 1983, and deliberately chose not to address the province of the jury in an ordinary inverse condemnation suit, or, by extension, a regulatory or categorical takings claim such as presented here.

¶55    In this connection, we also find that *Chessman*, *Matter of C.L.A.*, and *Sunburst Oil & Gas*, upon which appellants rely, are not particularly helpful in deciding the issue presently before the Court. Those cases simply establish that a right to a jury trial exists for the class of cases which existed at the time the Montana Constitution was adopted. *Chessman*, 31 Mont. at 584-88, 79 P. at 256-57. "The rule in Montana is that our state constitution only guarantees the right to a jury trial in the class of cases in which the right was enjoyed when the constitution was adopted." *Matter of C.L.A.*, 211 Mont. at 396, 685 P.2d at 933. However, none of these cases demonstrate that Montanans enjoyed a

right to jury trial on the issue of liability in an inverse condemnation, or categorical or regulatory takings case.

¶56 In this case, the District Court concluded that appellants would be entitled to a jury trial on the issue of damages if liability for the takings claim was established. The weight of authority tends to support the view that the right to jury trial in inverse condemnation suits—and, by extension, regulatory or categorical takings claims—is limited solely to the issue of damages. *Hensler v. City of Glendale*, 876 P.2d 1043, 1052 (Cal. 1994); *Tibbs v. City of Sandpoint*, 603 P.2d 1001, 1004 (Idaho 1979); *Dept. of Agriculture and Consumer Servs. v. Mid-Florida Growers, Inc.*, 521 So.2d 101, 104 (Fla. 1988); *Deisher v. Kan. Dept. of Transp.*, 958 P.2d 656, 663 (Kan. 1998); *Cumberland Farms, Inc. v. Town of Groton*, 808 A.2d 1107, 1126-27 (Conn. 2002); *Galvis v. State, Dept. of Transp.*, 167 P.3d 584, 589 (Wash. App. Div. 2 2007); *See also New Port Largo, Inc. v. Monroe Co.*, 95 F.3d 1084, 1092 (11th Cir. 1996) (concluding specifically that there is no jury requirement for deciding whether a regulatory takings has occurred). Under these authorities, the District Court presumptively satisfied appellants' constitutional right to a jury trial by providing a jury trial on the issue of damages.

¶57 Against this weight of authority, appellants have not cited a single case in which a court has held that the issue of liability in a categorical or regulatory takings case must be submitted to a jury. Although the question of whether a taking has occurred is in the nature of an "ad hoc, factual inquiry," *see Kafka*, ¶ 69, it appears that both state and federal courts are in near universal agreement that whether the facts show that a regulatory or categorical taking has occurred is ultimately a question of law for the court.

*E.g., Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 932-33 (Tex. 1998); *Chancellor Manor v. United States*, 331 F.3d 891, 898 (Fed. Cir. 2003); *Alevizos v. Metro. Airports Commn. of Minneapolis and St. Paul*, 216 N.W.2d 651, 660-61 (Minn. 1974); *Sieber v. State By and Through the Bd. of Forestry*, 149 P.3d 1243, 1246 (Or. App. 2006); *Vulcan Materials Co. v. City of Tehuacana*, 369 F.3d 882, 886-87 (5th Cir. 2004); *but see, Noghrey v. Town of Brookhaven*, 852 N.Y.S.2d 220, 221 (N.Y. App. Div. 2 Dept. 2008) (submitting the question of whether a regulatory taking has occurred for a jury's determination).  In fact, the authority in this area strongly supports the District Court's determination that "[w]hether a compensable taking has occurred is a question of law based on factual underpinnings." *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004) (citing *Maritrans, Inc. v. United States*, 342 F.3d 1344, 1350-51 (Fed. Cir. 2003)); *Moldon v. Co. of Clark*, 188 P.3d 76, 79 (Nev. 2008); *State v. Dunn*, 888 N.E.2d 858, 861 (Ind. App. 2008); *Scott v. Co. of Custer*, 178 P.3d 1240, 1243 (Colo. App. 2007).

¶58     Under § 26-1-201, MCA, "all questions of law" are to be decided by the court, while questions of fact go to the jury pursuant to § 26-1-202, MCA.  While takings claims arguably present "mixed questions of fact and law," *see Del Monte Dunes*, 526 U.S. at 721, 119 S. Ct. at 1644, and while it may be that some cases in the regulatory or categorical takings arena present questions of fact which should be submitted to a jury, the appellants here have not articulated what specific factual questions needed to be resolved by a jury in this case.  In fact, it appears from the record that there were no factual disputes concerning the effects of I-143 on appellants' businesses and private

27

property. Instead, the dispute centered on whether, as a legal matter, I-143 constituted a regulatory or categorical taking.

¶59 In sum, we decline at this time to adopt a bright-line rule regarding the role of a jury in the context of categorical or regulatory takings claims. However, we conclude that the District Court did not err in this case by reserving for itself the question of whether the State was liable for an uncompensated taking. Given the primarily legal nature of takings inquiries, a jury determination should be required only in those cases in which the resolution of a factual dispute is necessary in order to determine whether a taking has occurred. Here, there appears to have been no such dispute. The appellants have not pointed to any factual question which should have been decided by a jury, nor for that matter do they complain that any of the District Court's factual findings were in error. Instead, the gravamen of the appellants' challenge is that the District Court made an incorrect legal determination that a regulatory or categorical taking had occurred. Under these particular circumstances, therefore, we hold that the District Court did not err in deciding the takings question without the presence of a jury.

¶60 **Issue Three:** *Did the District Court err in concluding that Article II, Section 29 of the Montana Constitution does not provide any greater constitutional protection against the taking of private property than the Fifth Amendment to the U.S. Constitution, and that the same legal analysis applies to takings claims brought under the Fifth Amendment to the U.S. Constitution and Article II, Section 29 of the Montana Constitution?*

¶61 In its Decision and Order of October 22, 2004, the District Court, citing to *Western Energy Co. v. Genie Land Co.*, 227 Mont. 74, 737 P.2d 478 (1987), concluded that the same legal analysis, based on federal law under *Penn Central*, applies to takings

claims whether brought under the U.S. or Montana Constitution. Appellants argue that the District Court erred in reaching this conclusion, and assert that Article II, Section 29 of the Montana Constitution provides greater protection than the Fifth Amendment, thus requiring a different analysis. This provision reads as follows:

> **Eminent domain.** Private property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner. In the event of litigation, just compensation shall include necessary expenses of litigation to be awarded by the court when the private property owner prevails.

Mont. Const., Art. II, § 29.

¶62 Appellants assert that the constitutional protection against "taking and damaging" of property is a fundamental right because it occurs in Article II of the Montana Constitution and, therefore, the State must show a compelling interest that is narrowly-tailored to impose the least restraints possible on their property interests. Appellants maintain that the State has failed to meet this burden because it failed to demonstrate that I-143 substantially advanced any purported legitimate state interests such as protecting the tradition of fair chase hunting in Montana, or preventing the spread of CWD. *See* Opinion, ¶ 16 n. 2. Appellants assert that their position is supported by the plain language of Article II, Section 29, which protects against a "taking" or "damaging." Therefore, the inquiry is whether Article II, Section 29 of the Montana Constitution affords greater, more expansive rights than does the Fifth Amendment to the U. S. Constitution, to the extent that a wholly separate regulatory takings analysis need be performed under the Montana Constitution.

¶63    As we noted in *Kafka*, we have generally looked to federal case law for guidance when considering takings claims brought under Article II, Section 29—a practice that is consistent with that of other states with similar or identical language in their state constitutions. *See Kafka*, ¶ 30. Appellants and the Dissent have seized upon the "damaging" language in Article II, Section 29 to argue for a sweeping new interpretation of this provision.

¶64    It is important to bear in mind that Article II, Section 29 protects against a "taking" and "damaging" of private property. We take this occasion to reaffirm the position taken in *Kafka*, that the protection against a "taking" of private property under Article II, Section 29 is coextensive with the protection given under the Fifth Amendment. *Kafka*, ¶¶ 30-31. In other words, a takings analysis based on federal law under *Penn Central* or *Lucas* is to be applied to takings claims whether brought under the U.S. or Montana Constitutions. This practice is in accord with the overwhelming majority of states that have similar or identical language in their state constitutions.

¶65    The question then becomes what type of protection, and accompanying analysis, is provided against a "damaging" of private property. This "or damaged" language was adopted verbatim from the 1889 Montana Constitution, and already has a well-established meaning. In *Less v. City of Butte*, 28 Mont. 27, 72 P. 140 (1903), the plaintiff sued the city for damages to his property occasioned by a change in the grade and excavation of the street abutting his residence. As a result of the change, Less was confronted with a street graded and excavated to the depth of about seven feet below his home. Less claimed that his ability to use and enjoy his property had been significantly

infringed, as had his access to the public street. The District Court awarded him $500, and the city appealed. In affirming the district court, this Court stated:

> Constitutions which provide that "private property shall not be taken for public use without just compensation" are but declaratory of the common law, and contemplate the physical taking of property only. Under constitutions which provide that property shall not be "taken or damaged" it is universally held that "it is not necessary that there be any physical invasion of the individual's property for public use to entitle him to compensation." *Root v. B. A. & P. Ry. Co.*, 20 Mont. 354, 51 Pac. 155, and cases cited. The owner of a city lot "has a kind of property in the public street for the purpose of giving to such land facilities of light, of air, and of access to the street." *Bohm v. Ry. Co.*, 129 N. Y. 576, 29 N. E. 802, 14 L.R.A. 344. "These easements are property, protected by the Constitution from being taken or damaged without just compensation." *Root v. B. A. & P. Ry. Co.*, supra. Moreover, i t may frequently occur that "the consequential damage may impose a more serious loss upon the owner than a temporary spoliation or invasion of the property." *City of Atlanta v. Green*, 67 Ga. 386.

*Less*, 28 Mont at 32, 72 P. at 141 (other citations omitted).

¶66   Subsequently, in *Knight v. City of Billings*, 197 Mont. 165, 642 P.2d 141 (1982), we were called upon to address plaintiffs' complaints for inverse condemnation arising out of the improvements to 24th Street in Billings, which expanded the roadway to such an extent that the parties' front yards were unusable and the noise and traffic horrific for the homes now virtually atop these new traffic lanes. Relying upon *Less* and the "or damaged" language of Article II, Section 29, we concluded that the private property interests of the plaintiffs had been interfered with to such an extent as to constitute a "taking" by inverse condemnation. We cautioned, however, that our holding was limited to the unique situation before us "where a physical taking across the street occurred." *Knight*, 197 Mont. at 174, 642 P.2d at 146.

¶67  It thus appears that the "or damaged" language of the provision has been interpreted to apply to eminent domain proceedings, including inverse condemnation proceedings, where private property is taken or damaged for public use. In fact, during the debate over the 1972 Montana Constitution, the committee discussed this provision strictly in the context of eminent domain proceedings, using property taken for highway construction as the primary example in explaining what occurs when the offer by the government is, for example, too low or too high. *See* Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, pp. 1825-28.

¶68  Notably, the California state constitution contains the identical language as Article II, Section 29. California courts have, over the history of this provision, repeatedly been asked to expand the circumstances under which a private property owner may recover, with proponents contending that the "or damaged" language infers an intention to expand the scope of the provision outside the realm of eminent domain or public works. California courts have resisted this notion. As recently as 1995, in the case of *Customer Co. v. City of Sacramento*, 895 P.2d 900 (Cal. 1995), the Supreme Court of California, sitting en banc, rejected an attempt by a store owner to recover damages to his store occasioned by police action that was taken to enforce criminal laws. The court stated that "[t]he California Constitution of 1879 added the phrase 'or damaged' to the just compensation provision, but this change was not intended to expand the scope of the constitutional compensation provision beyond the ambit of eminent domain and public improvements." *Customer Co.*, 895 P.2d at 906 (citation omitted).

¶69 The point of the foregoing discussion is that the "or damaged" language of Article II, Section 29 is intended to apply to damage to real and private property occasioned by a taking of real property for public use. Neither the 1889 or 1972 Montana Constitutions evince any intent that it apply to regulatory takings or damages resulting therefrom. Moreover, the provision mandates that private property not be taken or damaged for public use without just compensation "having been first made to or paid into court for the owner." This language obviously contemplates a condemnation of property by the State, and the recognition that the appropriation will cause determinable consequential damages to property owners affected thereby—damages which can be ascertained at the time of the taking. Simply put, the plain language of Article II, Section 29 does not suggest that the provision was intended to apply to the types of damages a regulatory taking might arguably cause over time, after a regulation has taken its toll on a property owner. And, notably, neither the appellants nor the Dissent have cited a single case for the proposition that the "or damaging" language—which, incidentally, is present in roughly half of the state constitutions in this country, *see Kafka,* ¶ 30, n. 5—is intended to provide any greater protections in the regulatory taking context than does the Fifth Amendment to the U.S. Constitution, or that it applies to anything other than the consequential damages to the property of persons affected by a physical condemnation, or similar actions, initiated by the State.

¶70 The Dissent claims to have contradicted this proposition by citing to *Wild Rice River Estates v. City of Fargo,* 705 N.W.2d 850 (N.D. 2005), and *Manufactured Housing Communities v. State,* 13 P.3d 183 (Wash. 2000). However, an examination of these

cases confirms the accuracy of the analysis and conclusions presented in this Opinion with respect to the meaning of the "or damaged" language in Article II, Section 29.

¶71 *Manufactured Housing* did involve a regulatory taking claim under the Washington State Constitution, employing an analysis which was distinct from that employed under the Fifth Amendment. *Manufactured Housing*, 13 P.3d at 187. However, this case is not supportive of the Dissent's criticism. First, *Manufactured Housing* did not discuss the meaning of the "or damaged" language in the Washington State Constitution in the context of a regulatory takings claims. Thus, the significance of the Dissent's citation to this case in the present context is unclear. Second, the Washington takings test has four distinct inquiries, which are grounded partly in federal and partly in state law. *Manufactured Housing*, 13 P.3d at 187. The Dissent, however, does not propose a distinct new test, or indeed, any analogous test. Rather, the Dissent simply argues that the federal tests should not apply, and that, instead, whenever there is any damage to private property by state action, compensation is required—whether the action was actually a taking or not. This amounts to a radically scaled-back *Penn Central* analysis: There need be no inquiry into the character of the government action or the reasonable investment-backed expectations of the claimant; rather, the only inquiry is whether there was any economic impact. Since the Dissent does not provide any guidance or bright line as to how much economic impact is enough to trigger a damaging—relying more on a "I know it when I see it" reflex (*see* Dissent, ¶ 167)—it is difficult to envision how the State could confidently afford to regulate anything under such a regime. Arguably, any private property owner whose property was "damaged" by

state action, whether in the form of restrictions, fees, or regulations, would be entitled to seek compensation therefore from the public fisc. As Justice Holmes noted in *Pennsylvania Coal*, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 412, 413, 43 S. Ct. 158, 159 (1922).

¶72    Moreover, while *Wild Rice* did discuss the "or damaged" language in the North Dakota State Constitution, neither *Wild Rice* itself, nor the cases upon which it relied, involved or discussed any regulatory takings claims. In *Wild Rice*, the North Dakota Supreme Court, in interpreting identical language in its state constitution stated the following:

> Under N.D. Const. art. I, § 16, "[p]rivate property shall not be taken or damaged for public use without just compensation." This Court has said our state constitutional provision is broader in some respects than its federal counterpart because the state provision " 'was intended to secure to owners, not only the possession of property, but also those rights which render possession valuable.' "

*Wild Rice*, 705 N.W.2d at 856 (quoting *Grand Forks-Traill Water Users, Inc. v. Hjelle*, 413 N.W.2d 344, 346 (N.D. 1987)).

¶73    *Wild Rice* relied upon *Grand Forks*, which in turned relied upon *Donaldson v. City of Bismarck*, 3 N.W.2d 808, 816 (N.D. 1942). *Donaldson*, in turn, relied upon *King v. Stark County*, 271 N.W. 771 (N.D. 1937). None of these cases applied the "or damaged" language in the context of a regulatory takings claim even remotely similar to the claim at bar. However, in *King*, the North Dakota Supreme Court specifically described the

35

meaning of the "or damaged" language in its state constitution. Because the analysis is

*King* is instructive regarding the Dissent's contentions, we quote it at length:

> When the Fifth Amendment to the Constitution of the United States was adopted, it was therein provided that private property could not be taken by the United States for public use without just compensation. And the earlier State Constitutions likewise so provided. But this guaranty was too narrow. It insured compensation only in those cases where property was taken. The severity of the rule and the injustice resulting from its application were recognized. In England, by act of Parliament, compensation has been allowed since 1845 for damage caused by the construction of public works. In this country a wide diversity in the holdings of the courts of the several jurisdictions arose as to the meaning of the terms "taken" and "damaged."
>
> In 1870, the people of the State of Illinois amended their Constitution so that it provided that property should not be taken or damaged for public use without just compensation. And when the Constitution of the State of North Dakota was adopted this provision was inserted therein as section 14. Its history has been traced and its effect somewhat considered by this court heretofore. Nearly all of the State Constitutions now contain this provision. Under it the courts have uniformly held that there is liability not only for property taken, but also for consequential damages to property arising from the acts of the authorities in constructing public works. It is not necessary that there be a direct injury to the property itself in order to create this liability. It is sufficient to warrant a recovery if there be "some direct physical disturbance of a right, either public or private, which the plaintiff enjoys in connection with his property, and which gives to it an additional value, and that by reason of such disturbance he has sustained a special damage with respect to his property in excess of that sustained by the public generally." And the diminution in value of property resulting from the acts complained of is special and peculiar within the meaning of the rule.

*King*, 271 N.W. at 773-74 (internal citations omitted).

¶74     The Dissent faults the Court for its "originalist" approach to Article II, Section 29, and for declining to adopt its construction of Article II, Section 29. Begging the question of why "originalist" is equivalent to "abhorrent," (*see* Dissent, ¶¶ 173, 178), the fact is that virtually none of the legal rhetoric and argument posited by the Dissent here was

36

presented by the appellants themselves—either in the District Court or before this Court. We routinely admonish parties that we do not consider a party's change in legal argument, or new theories raised on appeal. *State v. Rahn*, 2008 MT 201, ¶ 22, 344 Mont. 110, ¶ 22, 187 P.3d 622, ¶ 22. Based on the issues actually raised and argued by the parties, and their failure to either effectively address our existing jurisprudence under Article II, Section 29, or argue for an expansion of existing law, we conclude that appellants have failed to establish that in the regulatory takings context, the "or damaged" language in Article II, Section 29 of the Montana Constitution affords more expansive rights than does the Fifth Amendment to the U.S. Constitution. Accordingly, we hold that the District Court did not err in concluding that the takings analysis based on federal law under *Penn Central* applied to the regulatory takings claims brought against the State in this case.

¶75 **Issue Four:** *Did the District Court err in denying appellants' claim that I-143 affected a categorical taking of their personal property?*

¶76 In its Decision and Order of October 22, 2004, the District Court rejected the notion that appellants' alternative livestock could be the object of a categorical takings claim under *Lucas*. A categorical taking occurs when a regulation or state action forces an owner to sacrifice all economically beneficial uses in the name of the common good, leaving the property "economically idle." *Kafka*, ¶ 68. In *Lucas*, the United States Supreme Court seemed to imply that such categorical takings claims could apply only to land, and not to personal property:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the

37

logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our "takings" jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. [393], at 413, 43 S.Ct. [158], at 159. And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale). *See Andrus v. Allard*, 444 U.S. 51, 66-67, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (prohibition on sale of eagle feathers). In the case of land, however, we think the notion pressed by the Council that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Takings Clause that has become part of our constitutional culture.

*Lucas*, 505 U.S. at 1027-28, 112 S. Ct. at 2899-2900 (footnotes omitted).

¶77 The District Court recognized that the Federal Circuit Court of Appeals has seemingly concluded that personal property could be the object of a categorical takings claim, *see e.g., Maritrans*, 342 F.3d at 1353-54, but chose to rely upon *Lucas* and concluded that private property, such as the alternative livestock in this case, could be the object of a regulatory, but not categorical, takings claim.

¶78 The appellants argue that the District Court erred in this conclusion as well. They argue that the portion of *Lucas* relied upon by the District Court is dicta, and further assert that no appellate court in the country has ever stretched this language in *Lucas* to preclude categorical takings of personal property. Instead, appellants urge this Court to

rely upon *Maritrans* and conclude that their alternative livestock and related equipment can form the object of a categorical taking.

¶79    We agree with the appellants that some courts in the Federal Circuit seem to have entertained claims for categorical takings of personal property.  In *Maritrans*, for instance, the Federal Circuit Court of Appeals considered whether a change in federal shipping regulations requiring oil carriers to use double hull tank barges caused a private company to sacrifice all economically beneficial uses of its single hull tank barges. *Maritrans*, 342 F.3d at 1354.  Ultimately, the Federal Circuit Court of Appeals determined that no categorical taking of the ships had occurred, because the single hull ships still retained some beneficial use after the change in regulations.  *Maritrans*, 342 F.3d at 1354-55.

¶80    Ultimately, we need not resolve the question of whether personal property, by itself, can form the object of a categorical takings claim.[3]  Even if a categorical taking of appellants' alternative livestock and related equipment was cognizable, we would nevertheless conclude that their categorical takings claims fail because the alternative livestock still have beneficial uses after the passage of I-143, as the District Court concluded.  The alternative livestock could be sold to out-of-state breeder operations or harvested for their meat and antlers.  Granted, this may not be a profitable use of the alternative livestock, but in order to make a claim for a categorical taking, appellants

---

[3]  However, we do note that, contrary to appellants' claims, some courts have interpreted *Lucas* in just such a manner. *See, e.g., Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441 (8th Cir. 2007) (holding that *Lucas* categorical taking rule "protects real property only").

must show that I-143 took *all* of the property's economically beneficial use.[4]  *See Lucas*,

505 U.S. at 1019 n. 8, 112 S. Ct. at 2895 n. 8.  Indeed, as the *Maritrans* court itself noted,

> Taking away a property's most beneficial use does not by itself constitute a compensable taking.  *Andrus*, 444 U.S. at 65-66, 100 S.Ct. 318.  In *Andrus*, the Court stated that "[a]t least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking."  *Id.*  Only where Congress takes away every beneficial use does a categorical taking occur.  *Id.*

*Maritrans*, 342 F.3d at 1354.

¶81    Accordingly, while we express no view on whether a *Lucas* categorical takings

analysis could apply to takings of personal property, we hold in this case that appellants

have failed to demonstrate that a categorical taking has occurred.  Thus, we affirm the

District Court.

¶82    **Issue Five:**  *Did the District Court err in concluding that I-143 did not effect a regulatory taking of appellants' private property?*

¶83    In its Findings of Fact, Conclusions of Law, and Order dated May 2, 2005, the

District Court denied appellants' claims for regulatory takings under *Penn Central*.  *See*

*Kafka,* ¶¶ 66-72 (describing in detail the three-factor *Penn Central* regulatory takings

analysis).  Under the economic impact factor of this analysis, *see Kafka*, ¶ 72, the District

Court made the following findings:  (1) I-143 prohibited the Wallaces' fee-shooting

business entirely, and eliminated the in-state market for the Buhmanns but did not

prohibit the sales of their elk and Sweet Pro feed supplements to out-of-state buyers; (2)

---

[4]  The reasons why the out-of-state markets were not profitable are beyond the scope of a categorical takings analysis.  Indeed, in this case it would be difficult, if not impossible, to isolate just how much of the profitability of sale to out-of-state markets was affected by previous outbreaks of CWD on Game Farms in Montana, or on other market forces unrelated to the passage of I-143.

neither the Wallaces nor Buhmanns lost any significant value in their land or improvements; (3) both the Wallaces and Buhmanns lost substantial value in their elk herds; (4) both parties lost future expected profits; (5) both businesses had already been negatively affected by prior outbreaks of CWD, and that CWD was in fact one of the reasons why appellants could not profitably dispose of their alternative livestock to out-of-state markets; and (6) the Wallaces had already made a decision to get out of the Game Farm business prior to the passage of I-143. Based on these findings, the District Court concluded that the economic impact factor of the *Penn Central* regulatory takings analysis test favored the appellants.

¶84 With respect to the appellants' "investment-backed expectations," *see Kafka*, ¶ 72, the District Court found that, while the appellants knew that the Game Farm industry was highly controversial and heavily regulated, the appellants relied on the regulatory scheme in place when they entered the industry, and had invested significant sums of money on the expectation that the industry would never be regulated out of business. However, the District Court noted that under *Penn Central*, this investment-backed expectation is measured from an objective standpoint in terms of its reasonableness. The District Court, citing to *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993) and *Allied-General Nuclear Servs. v. United States*, 839 F.2d 1572 (Fed. Cir. 1998), *see Kafka*, ¶¶ 58-59 (discussing *Mitchell Arms* and *Allied-General*), noted that courts have held such investment-backed expectations to a very high standard when claimants are operating in highly regulated fields such as firearms exportation (*Mitchell Arms*) and plutonium recycling (*Allied-General*). Moreover, claimants operating in such fields should expect

that the government can effectively regulate them out of business. In this regard, the District Court distinguished a case relied upon by appellants, *Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990), and held that this factor weighed in favor of the State and against finding a compensable taking.

¶85    Finally, with respect to the "character of the governmental action" prong, *see Kafka*, ¶¶ 70-71, the District Court concluded that this factor weighed in favor of the State because I-143 was a valid exercise of the State's police power to protect health and welfare, and that it affected an industry which was already subject to significant governmental regulation.[5]

¶86    Appellants maintain that the District Court erred in balancing the *Penn Central* factors and concluding that I-143 did not effect a taking of their private property, in particular the alternative livestock and specialized Game Farm equipment. With respect to the economic impact factor, appellants agree with the conclusion that this amounted to a significant impact. However, appellants assert that the District Court understated this impact because it evaluated the business as a whole, including the real estate (which had appreciated in spite of I-143), when appellants argue they did not claim a taking of their real property, but only of the business itself. They assert that a finding that I-143 led to a fifty-percent reduction in their business is misleading because it includes in the computation the value of appreciated real estate. Instead, the Wallaces argue the impact should be measured in terms of the market value of the alternative livestock before I-143

---

[5]    The District Court's analysis under this factor, as it inquired to a certain extent into the purpose and propriety of I-143, would no longer be valid under *Lingle*. *See* ¶ 16 n. 2.

42

($5.5 million dollars), versus its market value afterwards ($238,000). Similarly, the Wallaces argue that the true economic impact on their business by I-143 was that it destroyed it. The Buhmanns maintain I-143 had a similar impact on their business as well.

¶87 With respect to the character of the governmental action factor, appellants argue that this factor also weighs in favor of a compensable taking because I-143 does not address the problems associated with Game Farms (i.e., threat from CWD, or threatening the heritage of fair chase hunting) since it still permits the existence of Game Farms. In actuality, appellants argue, I-143 is nothing more than a price control measure designed to protect the State's competing enterprise of selling licenses for the shooting of wild, non-captive game. Finally, under the investment-backed expectations factor, appellants maintain that the District Court erred in relying upon *Mitchell Arms* and *Allied-General*, and that an analysis under *Yancey* supports their position. Appellants argue that they are not complaining that a particular regulation has made Game Farms more expensive, but that I-143 directly prohibited the sale of a product in a manner contrary to their reasonable investment-backed expectations, because the State has never exercised any regulation over the fees charged for privately shooting alternative livestock. While the participants in the Game Farm industry might have reasonably expected that they would have to maintain extra fencing or increase testing of their livestock, they had no reason to anticipate state interference in the price they would be able to charge for fee-shooting. Thus, they argue, this factor should weigh in their favor.

43

¶88 As we noted at the outset of this Opinion, many of the arguments raised in the case at bar were previously addressed in *Kafka*. At this point, we will highlight the relevant portions of the *Kafka* decision insofar as they address appellants' challenge to the District Court's *Penn Central* analysis. As an initial matter, we note that because the appellants in this case, like those in *Kafka*, allege that a mix of property interests have been taken by I-143, and do not allege that I-143 took all of their property interests (i.e., appellants do not claim that I-143 impacts the real property comprising their Game Farms at all) we will consider each of those business interests separately for purpose of a regulatory takings analysis. *Kafka*, ¶ 37.

¶89 Regarding the regulatory taking of intangible assets, i.e., appellants' businesses in this case, we held in *Kafka* that businesses themselves cannot be taken unless the government physically condemns those businesses and runs them itself. *See Kafka*, ¶¶ 55-63. In *Kafka* we analyzed both the *Mitchell Arms* and *Allied-General* decisions in reaching this conclusion. Therefore, for the reasons set forth in *Kafka*, we hold that appellants' businesses in this case were not taken by I-143.

¶90 Accordingly, this leaves appellants' elk and related Game Farm equipment. Under the economic impact prong of *Penn Central*, we agree with the District Court that I-143 had a significant impact on the value of the Wallaces' and Buhmanns' alternative livestock. For purposes of this factor, the District Court found that the Wallaces had invested approximately $666,166 in elk purchases from 1997 through 1999. Before I-143 the market value of the alternative livestock (approximately 850 head of elk) was roughly

$5.5 million; after I-143, the Wallaces liquidated the herd for $238,000.[6] The Wallaces' Game Farm equipment (the specialized feeding trucks) were purchased for roughly $600,000 and sold for $150,000. The Buhmanns similarly had invested in the alternative livestock, and although the ban on fee-shooting did not directly prohibit them from breeding alternative livestock, it did cause a similar devaluation in their herd and also impacted their ability to sell Sweet Pro in Montana. Accordingly, the economic impact factor weighs in appellants' favor.

¶91 However, with respect to the appellants' investment-backed expectations and character of the governmental action factors, we agree with the District Court that these factors weigh against finding a compensable taking. As we noted in *Kafka*, while I-143 impaired the profitable use of alternative livestock, it still allowed appellants every other use of their alternative livestock; thus, from the perspective of regulatory takings law, the character of the governmental action embodied in I-143 had a minimally intrusive effect on appellants' bundle of property interests in the alternative livestock. *See Kafka*, ¶¶ 87-88. The same would be true with respect to the Wallaces' specialized Game Farm equipment, as it could still be sold to out-of-state markets. Thus, while we disagree with the analysis employed by the District Court under this factor because it inquired into the

---

[6] In this case, appellants did not provide any expert testimony concerning the change in the fair market value of the alternative livestock before and after I-143. In *Kafka*, expert testimony was in fact presented showing that alternative livestock before I-143 was worth $5,000 per head, while after I-143 the livestock was worth $500 per head. This represented a roughly 90% devaluation. *Kafka*, ¶ 84. Here, no comparable testimony was provided. However, given the size of the Wallaces' herd (850 elk) and utilizing the evaluation figures employed in *Kafka*, the Wallaces' herd lost approximately 95% of its fair market value.

purposes and propriety of I-143 in a manner foreclosed by *Lingle*, (*see* Opinion, ¶ 80), we nonetheless agree with the District Court's conclusion that this factor weighs against finding a compensable taking. *See Wells Fargo Bank v. Talmage*, 2007 MT 45, ¶ 23, 336 Mont. 125, ¶ 23, 152 P.3d 1275, ¶ 23 (stating that we will affirm a district court's decision even if it reaches the right result for the wrong reason).

¶92    Similarly, under the investment-backed expectations prong, the regulative and speculative nature of the industry does play a significant role in determining whether a certain set of investment-backed expectations are "reasonable." As we did in *Kafka*, we conclude that appellants in this case could not maintain a reasonable investment-backed expectation that Game Farms, and by extension fee-shooting, would always be legal in Montana. *See Kafka*, ¶¶ 89-93. In this connection, we agree with the District Court that *Yancey* does not alter the regulatory takings analysis in this case. In *Yancey*, Andrew and Elizabeth Yancey (Yanceys) owned and operated a turkey breeding operation in Rockingham County, Virginia. *Yancey*, 915 F.2d at 1536. In 1983, the Yanceys acquired a rafter of turkey breeder hens for purposes of selling the hatching eggs to customers in other states. In mid-October 1983, an outbreak of a pathogenic Avian Influenza occurred in Lancaster County, Pennsylvania, prompting the United States Department of Agriculture (USDA) to impose a quarantine in that state, which was later extended to Rockingham County, Virginia as well. The quarantine prohibited the Yanceys from the interstate shipping of live poultry, manure from the poultry, litter used by the poultry, as well as carcasses, eggs and certain equipment. Although the Yanceys' flock was not affected by the influenza, they were unable to make productive use of the flock as they

intended, and had to maintain the flock at a cost of $1,800 per week. They ultimately decided to slaughter the flock and sell it for meat, although the flock had not been raised to be economically viable for that purpose. They received $20,887 for the flock.

¶93 The Yanceys subsequently filed a $63,566 indemnity claim with the USDA, representing the lost value from the flock as a result of the quarantine. The claim was denied and they filed a takings claim in the U.S. Claims Court under the Fifth Amendment. The claims court granted the Yanceys' Fifth Amendment claim, and the government appealed. On appeal, the Federal Circuit Court of Appeals had to determine whether the effects of the quarantine constituted a compensable taking under the Fifth Amendment. *Yancey*, 915 F.2d at 1539.

¶94 The *Yancey* court applied the regulatory takings analysis from *Penn Central*. It noted that the claims court had found that the Yanceys' flock had suffered a 77% devaluation as a result of the quarantine, because the healthy breeder flock would have been worth $91,616 if the quarantine had not been in place, and, further, that the Yanceys had no other alternative viable use for the flock other than slaughtering them so long as the quarantine remained in place. *Yancey*, 915 F.2d at 1539. Moreover, the court of appeals noted the lower court finding that the Yanceys only learned about the quarantine through the newspaper the day before it took effect and that they had investment-backed expectations to sell the hatching eggs to customers outside of Virginia—an action that was foreclosed by the immediate, unforeseen and disparate impact upon the Yanceys by the quarantine. *Yancey*, 915 F.2d at 1540.

¶95    In affirming the claims court's decision, the *Yancey* court explicitly distinguished its case from *Galloway Farms, Inc. v. United States*, 834 F.2d 998 (Fed. Cir. 1987).  In *Galloway Farms*, the Federal Circuit Court of Appeals held that a grain embargo imposed against the Soviet Union by President Jimmy Carter did not give rise to a compensable takings claim on behalf of grain farmers in the United States, in part because the grain embargo left open other markets.  *Galloway Farms*, 834 F.2d at 1003.  The *Yancey* court found its case distinguishable because the claims court had found that the Yanceys had no other choice but to sell their turkeys for substantially less than their value, while the grain farmers in *Galloway Farms* still had available markets.  *Yancey*, 191 F.2d at 1541-42. The court concluded that "[w]hen adverse economic impact and unanticipated deprivation of an investment backed interest are suffered, as when the poultry quarantine forced the Yanceys to sell their turkey flock, compensation under the Fifth Amendment is appropriate."  *Yancey*, 191 F.2d at 1542.

¶96    We agree with the District Court that *Yancey* is distinguishable from the present case with respect to the investment-backed expectations factor of the *Penn Central* analysis.  As a threshold matter, we note that the investment-backed expectations are measured from an objective, not subjective, standpoint of reasonableness.  *See Cienega Gardens v. United States*, 331 F.3d 1319, 1346 (Fed. Cir. 2003) ("This factor also incorporates an objective test—to support a claim for a regulatory taking, an investment-backed expectation must be 'reasonable.' ").    Moreover, the inquiry into the reasonableness of the investment backed expectation is unique to each case and cannot be

reduced to any "set formula." *See Palazzolo v. R. I.*, 533 U.S. 606, 636, 121 S. Ct. 2448, 2467 (2001) (O'Connor, J., concurring).

¶97    In *Yancey*, the Court of Appeals was bound by factual determinations from the Court of Claims which supported the conclusion that the quarantine in that case was completely unexpected. The findings by the District Court in this case cut the other way, because the District Court noted that under an objective standard of reasonableness, the appellants could not maintain an expectation that the Game Farm industry would be permitted to continue indefinitely. The District Court specifically found that a previous outbreak of CWD on a Montana Game Farm in 1997 had already impeded the Wallaces' sale of alternative livestock to out-of-state markets after the imposition of a moratorium on out-of-state sales, and that their ability to sell the Big Velvet Ranch before the passage of I-143 was negatively impacted from the previous CWD outbreaks. Additionally, the appellants were aware of the highly controversial nature of Game Farms and the fact that CWD presented significant risks making it a highly regulated industry.

¶98    With respect to the "reasonableness" of investment-backed expectations, the analogy between the Game Farm industry and other industries such as the importation of firearms discussed in *Mitchell Arms*, or the plutonium recycling industry discussed in *Allied-General*, is actually quite apt, because at the time these Game Farms were in existence, CWD posed a very serious threat to the native elk and deer populations within Montana, given that it was impossible to completely prevent alternative livestock from escaping the confines of a Game Farm. Moreover, there was no live test for CWD which

49

is a permanent and irreversible disease. *Hagener*, ¶ 25.[7] Moreover, the District Court explicitly found that the exact incubation period and means of transmitting CWD are not completely understood. In fact, it was primarily the grave threat posed by CWD which required the extensive regulation of the Game Farm industry in Montana. *See Kafka*, ¶ 8. It was against the backdrop of these inherent dangers that appellants were operating. Moreover, these dangers were publicly known and very controversial among many members of the public. Thus, unlike *Yancey*, where the poultry producers would have no reason to expect that a healthy flock of turkeys would have to be suddenly destroyed, those in the Game Farm industry knew that their alternative livestock carried with them an inherent danger of spreading CWD which could never be eliminated and which could prove uncontrollable if it made its way into the genetic make-up of the native wildlife populations. These facts, together with the highly regulated nature of the industry, must be considered when evaluating the "reasonableness" of appellants' investment-backed expectations.

¶99 As we noted in *Kafka*, the *Penn Central* analysis calls for a balancing of the factors in order " 'to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain.' " *Kafka*, ¶ 94 (quoting *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082). After weighing the factors in the case, we conclude that the economic impact factor weighs in favor of a compensable taking, while the character of the governmental

---

[7]   As we noted in *Hagener*, it was limitations on testing for CWD which led the legislature to impose a moratorium on new Game Farms in 2000. This moratorium was a response to an outbreak of CWD on a Phillipsburg Game Farm in 1999. *Hagener*, ¶ 25.

action and reasonable investment-backed expectations factors do not. Accordingly, for the same reasons we denied similar claims in *Kafka*, we conclude the District Court did not err in denying appellants' regulatory takings claims. *See Kafka*, ¶ 94.

## CONCLUSION

¶100 Based upon the foregoing, we affirm the District Court.


/S/ PATRICIA COTTER


We concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART

/S/ DEBORAH KIM CHRISTOPHER
District Court Judge Deborah Kim Christopher
sitting for Justice John Warner



Justice Jim Rice, concurring in part and dissenting in part.

¶101 I concur with the Court's resolution of Issues One, Two and Three. I dissent from Issues Four and Five, as I would hold that a taking of Plaintiffs' property was effectuated by the enactment of I-143 under the analysis provided by Justice Nelson's dissenting opinion in *Kafka*.


/S/ JIM RICE


51

Justice James C. Nelson, dissenting.

¶102   I dissent from the Court's decision on Issues Three, Four, and Five.  I do so for the reasons articulated in my dissent in the companion case, *Kafka v. Montana Dept. of Fish, Wildlife and Parks*, 2008 MT 460, ¶¶ 96-248, ___ Mont. ___, ¶¶ 96-248, ___ P.3d ___, ¶¶ 96-248 (Nelson, Rice, & Swandal, JJ., dissenting) (hereinafter, "*Kafka Dissent*"), and for the additional reasons set forth below.  I do not express any views on the Court's resolution of Issues One and Two.

## I.  INTRODUCTION

¶103   As it did in *Kafka*, the Court again holds that business owners in the alternative livestock industry are entitled to no compensation whatsoever for the outright destruction of their businesses by Initiative No. 143 ("Initiative" or "I-143").  The State encouraged people to embark on this "viable economic opportunity," facilitated their investment of millions of dollars into such enterprises, and granted them a statutory right to perpetual renewal of their business licenses.  Then, the State up and legislated the businesses out of existence.  According to the Court, such action does not constitute a taking or damaging of property under Article II, Section 29 of the Montana Constitution.

¶104   In reaching this conclusion, and in spite of the plain language of Article II, Section 29, the Court makes the astounding pronouncement that Article II, Section 29 is little more than a constitutional redundancy—an empty provision guaranteeing nothing beyond what the federal courts deem compensable under the Fifth Amendment to the United States Constitution.  This pronouncement finds no support in the text of Article II, Section 29, which is facially broader than the Fifth Amendment.  It finds no support in

the history of Article II, Section 29 and its predecessor, Article III, Section 14 of the 1889 Constitution, which were intended to provide greater protection than the Fifth Amendment against infringements on Montanans' property rights. It finds no support in the prior decisions of this Court, which recognize independent protections of property under the Montana Constitution. And it is contrary to the Constitutional Convention delegates' charge that this Court "revitalize" the civil rights of Montanans.

¶105 Rather, the Court's decision is based on one single proposition: that the delegates to the 1889 and 1972 Constitutional Conventions and the voters who approved these Constitutions intended for the meaning of "taking" and "damaging" property to be frozen in time. Adopting an originalist interpretation of Article II, Section 29, the Court rejects the notion that the terms "taking" and "damaging" together were meant to provide a broader range of protection than extant Fifth Amendment jurisprudence provides. Instead, the Court prefers to restrict Article II, Section 29 to only those situations which were not covered by the Fifth Amendment in the late nineteenth century: "determinable consequential damages" resulting from public works projects. I strenuously dissent from this emasculation of Article II, Section 29.

¶106 Both the Fifth Amendment and Article II, Section 29 require just compensation for the taking and damaging of property effected by I-143. I comprehensively analyzed this issue under the Fifth Amendment in *Kafka* (*see Kafka Dissent*, ¶¶ 177-240); and since there are no material factual distinctions between *Kafka* and the present case, it is not necessary to repeat that analysis here. Rather, I focus in this Dissent primarily on Article II, Section 29 and explain why, contrary to the Court's decision, this provision entitles

the Buhmanns and the Wallaces (collectively, "the Ranchers") to just compensation. First, however, I address several factual and legal issues argued by the Sportsmen, the State, and the Ranchers in this case. I addressed some of these issues in *Kafka*; accordingly, I simply reiterate the critical points here as foundation for the ensuing analysis.

## II. PRELIMINARY FACTUAL AND LEGAL ISSUES

### A. The Sportsmen's Explanation of I-143

¶107 It has been a lawful "business or occupation" in this State since 1917 to acquire, breed, own, harvest, sell, and otherwise control privately owned game animals on an alternative livestock ranch.[1] This activity has been regulated, and the regulations have become more rigorous over the years. At the same time, however, the Legislature has enacted provisions designed specifically to protect the business owners' interests—e.g., through statutory recognition of their alternative livestock as "private property" and their businesses as "viable economic opportunities," and through the statutory guarantee that their alternative livestock ranch licenses would be renewed each year upon payment of the renewal fee and compliance with all recording and reporting requirements. *See generally Kafka Dissent*, ¶¶ 103-109.

¶108 I-143, which was passed on November 7, 2000, gutted the alternative livestock industry and rendered the regulatory scheme pointless. The Sportsmen, who were "the principle forces behind the passage of I-143," sought to snuff out alternative livestock

---

[1] The Court prefers the term "game farm." Opinion, ¶ 3. The statutory scheme, however, uses the term "alternative livestock ranch." *See* § 87-4-406(2), MCA. "Game farm" is nowhere mentioned. Accordingly, I use the term "alternative livestock ranch."

ranching without the public's having to foot the bill. To that end, they "carefully crafted" a citizen initiative (I-143) to prohibit remuneration for shooting alternative livestock on alternative livestock ranches, thereby forcing all businesses in the industry to operate, essentially, without any income. *See Kafka Dissent*, ¶¶ 114-120. As counsel for the Sportsmen explained during oral argument:

> There was a recognition by my clients that if they passed a statute that simply said, "Every game farm is done tomorrow," that that would be a very difficult takings claim to defend against. And we didn't want to have to go down that road. And so the statute was carefully crafted to address the problem in a way that was not offensive to taking but at the same time benefitted the wildlife and the wildlife management of this State.

The assertion that the Sportsmen's transparent charade is "not offensive" to the guarantee of just compensation for a taking or damaging of private property is preposterous.

¶109 In any event, the Sportsmen did not detail their intentions to the voters. Rather, according to the Sportsmen, "[f]oremost among the issues presented to the voters in I-143 were concerns about disease, loss of fair chase hunting ethics and European style privatization of wildlife." In other words, the Sportsmen told the voters not that I-143 had been "carefully crafted" to obliterate an entire industry—an industry that had been sanctioned, encouraged, and nurtured by the State for 83 years, no less—but that I-143 was "aimed" at the alluring goal of "protecting Montana's wildlife and hunting heritage from a variety of dangers posed by game farms." An analysis of the Initiative, however, reveals that it did not actually address any of these dangers. As a matter of fact, the Sportsmen tacitly admit that I-143 was a fraud on Montana voters.

¶110   For instance, regarding disease, the Sportsmen paint a grim picture.  They state that "[c]ontact between game farm animals and wildlife can result in disease and parasite transmission, with devastating impacts to native wildlife."  They complain that "[g]ame farm enclosures require only a single fence and do not prevent nose to nose contact between wild ungulates and game farm animals."  Plus, "[i]t is virtually impossible to keep game farm animals from coming into contact with wild animals, as escaped animals are a fact of life for game farm owners."  Moreover, aside from direct contact, "[s]ome diseases are transmitted by intermediate hosts, making any form of enclosure ineffective for disease prevention."

¶111   The Sportsmen argued these concerns to the voters.  Indeed, the Sportsmen cite the 2000 Voter Information Pamphlet for the proposition that "[o]ne of I-143's primary purposes was to minimize the CWD threat to Montana's wildlife."  ("CWD" is short for "chronic wasting disease.")  Accordingly, given these concerns, one would expect I-143 to target the problems related to diseases, perhaps through more stringent fencing and enclosure requirements, additional testing requirements, or even an outright seizure of all alternative livestock along with a prohibition on private ownership of alternative livestock.  However, I-143 did none of these things.  As the Sportsmen acknowledge, "[g]ame farms licensed prior to November 2000, are still legal in Montana, even after I-143," and "[g]ame farm operators are free to 'acquire, breed, grow, pursue, handle, sell or dispose' of game farm animals."  I-143 imposed no new fencing or testing requirements.  It does not prohibit people from owning alternative livestock on alternative livestock ranches, and it does not address the problem of transmission of

diseases through intermediate hosts or inadequate fencing. In spite of the dire threat posed by diseases, the Sportsmen's initiative contains nothing addressing that issue.

¶112 As for hunting ethics, the Sportsmen state that "Montana has a proud heritage of ethical hunting and the protection of wildlife, and I-143 was intended to protect the state's interest in those traditions." They assert that "[i]n addition to the enormous economic benefits of traditional big game hunting, Montanans hold dear their hunting tradition as an important component of their western heritage," particularly "the concept of fair chase hunting." The Sportsmen explain that they and other citizens "opposed the 'penned hunts' offered by many game farms" because "[s]hooting an animal in an enclosed facility is repugnant to these ethical hunting traditions." Again, citing the 2000 Voter Information Pamphlet, the Sportsmen state that "[t]he protection of fair chase hunting, as an ethical consideration for Montanans, was an integral part of I-143's provisions to eliminate penned shoots."

¶113 I-143, however, contains no "provisions to eliminate penned shoots." I-143 did three things: it prohibited the establishment of any new alternative livestock ranches; it revoked the right of existing alternative livestock businesses to transfer their alternative livestock ranch licenses; and it prohibited charging a fee or other remuneration for shooting alternative livestock on an alternative livestock facility. *See generally* Laws of Montana 2001, 2000 Ballot Issues, Initiative No. 143, §§ 1, 4, 6. But "shooting an animal in an enclosed facility" is still perfectly legal. Indeed, the Sportsmen concede that "[g]ame farm operators are not prohibited by I-143 from shooting or otherwise 'harvesting' their animals themselves." For that matter, I-143 does not prohibit the

friends, relatives, and acquaintances of an alternative livestock operator from shooting alternative livestock on an alternative livestock ranch. "The only activity on licensed game farms prohibited under I-143," the Sportsmen state, "is that of allowing a fee-paying individual the opportunity to personally shoot a game farm animal." But anyone who is not a "fee-paying individual" may still participate in penned hunts and "personally shoot a game farm animal" notwithstanding I-143. So much for protecting Montana's "proud heritage" of ethical, fair-chase hunting.

¶114 Lastly, with respect to European-style privatization of wildlife, the Sportsmen state that "[c]entral to Montana's hunting heritage is the availability of big game hunting to ordinary individuals: inexpensive licenses available to all citizens, access to big game on public and private lands . . . and plentiful populations of native wildlife." According to the Sportsmen, "I-143's proponents made this a central issue in their campaign to ban penned shoots" (citing the 2000 Voter Information Pamphlet). Yet, as the Sportsmen are forced to concede, "I-143 allow[s] the continued ownership of game farms and elk," and alternative livestock ranchers "are free to 'acquire, breed, grow, pursue, handle, sell or dispose' of game farm animals" in Montana. Moreover, I-143 does not provide for less expensive hunting licenses or greater access to big game on public and private lands.

¶115 In sum, the Sportsmen's initiative purported to address disease, hunting ethics, and privatization of wildlife, but I-143 did not actually address any of these. Rather, it was "carefully crafted" to achieve the Sportsmen's ulterior goal of putting all alternative livestock ranches out of business. The Proponents' argument in favor of the Initiative was blatantly misleading in assuring voters that "[e]xisting game farms will be allowed to

58

continue all operations, except for canned hunts." I-143 was designed to shut down *all* alternative livestock ranches by forcing them to operate with no income.

¶116 The Sportsmen claim that I-143 merely "added to the existing restrictions" on the operation of alternative livestock ranches. They also assert that the Ranchers have not established that the "additional restrictions" are "so onerous that the effect is the same as 'an appropriation of property through eminent domain or physical appropriation.' " This is hypocrisy personified. I-143 did not "add" to "existing restrictions." It devised a whole new restriction previously unheard of in the industry: no remuneration for shooting alternative livestock. The Sportsmen's contrary characterization of I-143 is absurd. It is one thing to strengthen fencing, testing, and reporting requirements through "additional restrictions," as the Legislature did over the years. But it is quite another to require alternative livestock ranchers to operate with no income through the expedient of prohibiting remuneration for the key economic activity on which their businesses depended: fee shooting. The Sportsmen "carefully crafted" I-143 to destroy the Ranchers' businesses, and they succeeded in doing so. It is difficult to conceive of a regulation that more closely approximates "an appropriation of property."

¶117 In conclusion, the Ranchers entered the alternative livestock industry in the 1990s. Alternative livestock ranching had been in existence for over 75 years. The 1983 Legislature had enacted explicit statutory rights to protect the interests of participants in the industry. *See Kafka Dissent*, ¶¶ 105-106. As late as 1999, the State characterized alternative livestock ranching as "a viable economic opportunity for any private property owner as well as the traditional livestock producers who are interested in diversifying

their ranch productivity." Section 87-4-431, MCA. Moreover, as the State reluctantly conceded at oral argument in *Kafka*, "There is some evidence to suggest that it was the policy of the political branches of government to encourage people to look at game farming as an alternative to traditional agriculture -- actually, to subsidize traditional agriculture so they could stay on the farms and ranches." The Sportsmen, however, objected to alternative livestock ranching. They decided to shut down the industry. They did so for the stated purpose of "protecting Montana's wildlife and hunting heritage." They argued to the voters that I-143 was intended to benefit the entire Montana populace. Yet, the Sportsmen sought to place all of the economic costs associated with achieving this goal on the alternative livestock ranchers. They sought, in other words, to give the public something for nothing.

¶118 The Sportsmen "represent the voices of thousands of Montana men and women who believe I-143 is vital to the protection of Montana's wildlife and to the tradition of fair chase hunting." According to the Sportsmen, "I-143 was designed and enacted to address very serious dangers to Montana's wildlife and fair chase hunting heritage." It has been said that the "guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960). On this principle alone, it seems abundantly obvious that the costs of achieving the Sportsmen's goals must be borne by the public as a whole, not disproportionately placed on the shoulders of the alternative livestock ranchers.

### B. The State's and the Ranchers' Means-Ends Arguments

¶119  The State asserts that a "means-ends" analysis of I-143—i.e., inquiring whether the Initiative substantially advances some legitimate public purpose—is improper in the takings context. The State is correct, at least with respect to the Fifth Amendment. The Supreme Court has explained that the critical question in a regulatory takings analysis is whether the regulation is "so onerous that its effect" is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537, 539, 125 S. Ct. 2074, 2081, 2082 (2005). A "substantially advances" test is ineffective for answering this question. It reveals nothing about the magnitude or character of the burden that the regulation imposes upon private property rights. Rather, it probes the regulation's underlying validity. *Lingle*, 544 U.S. at 542, 543, 125 S. Ct. at 2084. Yet,

> such an inquiry is logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. The Clause expressly requires compensation where government takes private property *for public use*. It does not bar government from interfering with property rights, but rather requires compensation in the event of *otherwise proper interference* amounting to a taking. Conversely, if a government action is found to be impermissible—for instance because it fails to meet the "public use" requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action.

*Lingle*, 544 U.S. at 543, 125 S. Ct. at 2084 (citation and some internal quotation marks omitted).

¶120  The Ranchers acknowledge the Supreme Court's clarifications of federal takings doctrine in *Lingle*; however, they point out that "*Lingle* did not, and in fact could not,

foreclose an independent interpretation of the Montana Constitution." The Ranchers suggest that under Article II, Section 29, "[i]n order to avoid the constitutional mandate of just compensation, the State must show a compelling state interest that is narrowly tailored to impose the least restraints possible on [the Ranchers'] interests." In an alternative formulation, the Ranchers assert that "the State must demonstrate that it has employed the least restrictive means in accomplishing the purposes of I-143." While I agree with the Ranchers that this Court may—indeed, must—provide an independent interpretation of Article II, Section 29, I agree with the State that the Ranchers' proposed test is inapt for analyzing claims brought under Article II, Section 29.

¶121 Article II, Section 29 states, in pertinent part, that "[p]rivate property shall not be taken or damaged for public use without just compensation to the full extent of the loss." This language requires compensation where the State takes or damages private property "for public use," but it does not require the "public use" to be "compelling," nor does it require the State to employ "the least restrictive means" for achieving its goals. Rather, when considering whether a regulation has taken or damaged private property, the analysis presupposes that the regulation is permissible and the focus is properly directed to the regulation's "effect" on the property and whether just compensation is owed. *Cf. Lingle*, 544 U.S. at 537, 543, 125 S. Ct. at 2081, 2084.

¶122 It thus makes little sense to inquire whether the State has employed "the least restrictive means" of achieving a "compelling" state interest. Whether or not the State has done so may tell us whether the regulation sweeps more broadly than is necessary or whether the regulation fails to meet the "public use" requirement. But it tells us nothing

about the regulation's effect and the burden the regulation imposes on private property rights. In other words, it does not tell us whether property has been taken or damaged.

¶123 Moreover, even if the least restrictive means have been employed and even if the State's interest is compelling, the property owner still may have suffered a taking or damaging of property. In this connection, the following reasoning by the Supreme Court in *Lingle* is persuasive:

> The owner of a property subject to a regulation that *effectively* serves a legitimate state interest may be just as singled out and just as burdened as the owner of a property subject to an *ineffective* regulation. It would make little sense to say that the second owner has suffered a taking while the first has not. Likewise, an ineffective regulation may not significantly burden property rights at all, and it may distribute any burden broadly and evenly among property owners. The notion that such a regulation nevertheless "takes" private property for public use merely by virtue of its ineffectiveness or foolishness is untenable.

*Lingle*, 544 U.S. at 543, 125 S. Ct. at 2084. For these reasons, the Supreme Court's rejection of means-ends analysis under the Fifth Amendment is sensible and should apply equally under Article II, Section 29.

¶124 That said, the State inexplicably proceeds to argue the converse of the Ranchers' proposed test. The State asserts that "property rights are subject to reasonable exercise of the police power" and that Article II, Section 29 does not "alter in a fundamental way the police power to adopt reasonable regulations that protect public health, safety, and welfare." Based on *Mugler v. Kansas*, 123 U.S. 623, 8 S. Ct. 273 (1887), the State insists that "the government cannot be compelled to pay compensation whenever it reasonably determines that a commercial activity is injurious to public health, safety, or welfare."

¶125 The State's position, in short, is that it cannot be required to pay compensation where the challenged regulation is a valid exercise of the police power related to a commercial activity. Of course, the corollary of this rule is that the government *can* be required to pay compensation where the challenged regulation is an *invalid* exercise of the police power related to a commercial activity—the very proposition the State goes to great lengths to refute. But there are additional flaws in the State's approach.

¶126 First, *Mugler* stands for the limited proposition that the government need not pay compensation when it exercises its power to prohibit a noxious use of property, i.e., a use akin to a public nuisance. *See Kafka Dissent*, ¶¶ 126-129. However, alternative livestock ranching, which was done and maintained under the express authority of Title 87, chapter 4, part 4, MCA, was in no way a public nuisance, *see* § 27-30-101(2), MCA, and the State may not escape paying just compensation for the Ranchers' losses through the mere expedient of declaring that which formerly was *not* a public nuisance to have been a public nuisance all along, *see Kafka Dissent*, ¶¶ 132-134. In this regard, the State's smug condemnation of the alternative livestock industry as some sort of noxious or abhorrent threat to the public health, safety, and welfare rings hollow in light of the State's 83-year role in creating, developing, and nurturing the industry in the first place.

¶127 Second, the Supreme Court has explicitly rejected the notion that a valid police power regulation never requires compensation to the owner. In *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886 (1992), the Court stated that there are "limits to the noncompensable exercise of the police power." *Lucas*, 505 U.S. at 1026, 112 S. Ct. at 2899. Otherwise, if "the uses of private property were subject to unbridled,

uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].' " *Lucas*, 505 U.S. at 1014, 112 S. Ct. at 2892-93 (brackets in *Lucas*) (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922)).

¶128 In conclusion, whether I-143 employs "the least restrictive means" of achieving a "compelling" state interest is irrelevant to the analysis under Article II, Section 29. Rather, in considering whether the Initiative took or damaged the Ranchers' property, the analysis presupposes that the regulation is permissible and the focus is on the regulation's effect on the Ranchers' property. Likewise, and for the same reasons, the State cannot escape paying just compensation on the ground that I-143 represents a "reasonabl[e] determin[ation] that [alternative livestock ranching] is injurious to public health, safety, or welfare."

## III. ANALYSIS OF THE RANCHERS' CLAIMS

### A. Analytical Framework

¶129 The Ranchers brought this action to recover for a regulatory taking or damaging of their property caused by the passage of I-143. Such an action, "in which a property owner, in the absence of a formal condemnation proceeding, seeks to recover from a governmental entity for the appropriation of his property interest," is commonly referred to as "inverse condemnation." Julius L. Sackman, *Nichols on Eminent Domain* vol. 2A, § 6.03[2], 6-182.1 (3d ed., Matthew Bender 2006). Whereas a condemnation proceeding typically involves an action by the condemnor to acquire title to property, inverse condemnation is an action by the property owner against a governmental defendant to

65

recover the value of property that has been taken or damaged, even though no formal exercise of the power of eminent domain has been attempted by the government. *See United States v. Clarke*, 445 U.S. 253, 257, 100 S. Ct. 1127, 1130 (1980); *see also e.g. Less v. City of Butte*, 28 Mont. 27, 72 P. 140 (1903) (inverse condemnation action to recover for damage to property occasioned by a public works project); *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 316, 107 S. Ct. 2378, 2386 (1987) ("While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings."). "Such a suit is 'inverse' because it is brought by the affected owner, not by the condemnor. The owner's right to bring such a suit derives from the self-executing character of the constitutional provision with respect to condemnation." *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 5 n. 6, 104 S. Ct. 2187, 2191 n. 6 (1984) (citation and some internal quotation marks omitted).

¶130 As noted, Article II, Section 29 states, in pertinent part, that "[p]rivate property shall not be taken or damaged for public use without just compensation to the full extent of the loss." In analyzing a claim for just compensation in the context of an inverse condemnation action, the court first determines whether the plaintiff possesses a constitutionally protected property interest. *See Germann v. Stephens*, 2006 MT 130, ¶ 27, 332 Mont. 303, ¶ 27, 137 P.3d 545, ¶ 27; *Seven Up Pete Venture v. State*, 2005 MT 146, ¶ 26, 327 Mont. 306, ¶ 26, 114 P.3d 1009, ¶ 26; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000, 104 S. Ct. 2862, 2871 (1984) (articulating the same threshold

inquiry under federal law). Whether one has a protected property interest is a question of law. *Kiely Construction v. City of Red Lodge*, 2002 MT 241, ¶ 25, 312 Mont. 52, ¶ 25, 57 P.3d 836, ¶ 25. If the plaintiff possesses a protected property interest, the court then determines whether a part or a whole of that interest has been taken or damaged for public use, thus entitling the plaintiff to just compensation. *See* Mont. Const. art. II, § 29; *Monsanto*, 467 U.S. at 1000-01, 104 S. Ct. at 2871; *Members of Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005). The issue of whether a taking has occurred is a question of law based on factual underpinnings. *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377 (Fed. Cir. 2008).

### B. Analysis of the Ranchers' Claims under Article II, Section 29

### 1. General Approach

¶131 It is well-established that the rights enumerated in the Declaration of Rights of Montana's 1972 Constitution (i.e., those set forth in Article II) are "fundamental rights." *Walker v. State*, 2003 MT 134, ¶ 74, 316 Mont. 103, ¶ 74, 68 P.3d 872, ¶ 74; *State v. Tapson*, 2001 MT 292, ¶ 15, 307 Mont. 428, ¶ 15, 41 P.3d 305, ¶ 15; *Wadsworth v. State*, 275 Mont. 287, 299, 911 P.2d 1165, 1172 (1996). This means that each of the Article II rights is a significant component of liberty, the alleged infringement of which triggers the highest level of scrutiny and, thus, the highest level of protection by the courts. *Walker*, ¶ 74; *Wadsworth*, 275 Mont. at 302, 911 P.2d at 1174; *see also e.g. State v. Mount*, 2003 MT 275, ¶ 98, 317 Mont. 481, ¶ 98, 78 P.3d 829, ¶ 98; *Mont. Environmental Info. Center v. Dept. of Environmental Quality*, 1999 MT 248, ¶ 64, 296 Mont. 207, ¶ 64, 988 P.2d 1236, ¶ 64. For the reasons discussed earlier in Part II-B, our analysis under Article II,

Section 29 does not involve "scrutiny" of the governmental action, except insofar as the requirement of a "public use" has been raised. But our analysis must afford "the highest level of protection" of private property rights. *Walker*, ¶ 74.

¶132 In this connection, we interpret Article II rights mindful of the other rights set out in the Montana Constitution. In *Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, we explained that

> Montana's Constitution, and especially the Declaration of Rights, is not simply a cook book of disconnected and discrete rules written with the vitality of an automobile insurance policy. Rather, our Constitution, and in particular its Declaration of Rights, encompasses a cohesive set of principles, carefully drafted and committed to an abstract ideal of just government. It is a compact of overlapping and redundant rights and guarantees.

*Armstrong*, ¶ 71.

¶133 We accordingly have interpreted independent sections of Montana's Constitution together, so as to give effect to Article II's coordinate, overlapping, and redundant guarantees. Possibly the most repeated example of this is our interpretation of the right not to be subjected to unreasonable searches and seizures (Article II, Section 11) in conjunction with the right to privacy (Article II, Section 10). *See e.g. State v. Siegal*, 281 Mont. 250, 257-78, 934 P.2d 176, 180-92 (1997), *overruled in part on other grounds*, *State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19.[2]

---

[2] *See also e.g. State v. Bullock*, 272 Mont. 361, 373-84, 901 P.2d 61, 69-76 (1995); *State v. Scheetz*, 286 Mont. 41, 45-51, 950 P.2d 722, 724-28 (1997); *State v. Bassett*, 1999 MT 109, ¶¶ 22-45, 294 Mont. 327, ¶¶ 22-45, 982 P.2d 410, ¶¶ 22-45; *State v. Elison*, 2000 MT 288, ¶¶ 45-58, 302 Mont. 228, ¶¶ 45-58, 14 P.3d 456, ¶¶ 45-58; *State v. Lovegren*, 2002 MT 153, ¶¶ 18-25, 310 Mont. 358, ¶¶ 18-25, 51 P.3d 471, ¶¶ 18-25; *State v. Tackitt*, 2003 MT 81, ¶¶ 17-31, 315 Mont. 59, ¶¶ 17-31, 67 P.3d 295, ¶¶ 17-31.

¶134   In *Siegal*, we explained that

> while we analyze most search and seizure questions implicating Article II, Section 11 of Montana's Constitution under traditional Fourth Amendment principles enunciated by the federal courts and adopted in our own case law, in certain instances where Montana's constitutional right of privacy, Article II, Section 10, is also specially implicated, we must, of necessity, consider and address the effect of that unique constitutional mandate on the question before us.

*Siegal*, 281 Mont. at 264-65, 934 P.2d at 184.  Similarly, in *Walker*, we reasoned:

> Just as we read the privacy provision of the Montana Constitution in conjunction with the provisions regarding search and seizure to provide Montanans with greater protections from government intrusion, so too do we read the dignity provision of the Montana Constitution together with Article II, Section 22 to provide Montana citizens greater protections from cruel and unusual punishment than does the federal constitution.  The federal constitution does not expressly provide for the right to human dignity.

*Walker*, ¶ 73.  We thus have recognized that while traditional principles enunciated by the federal courts and adopted in our own caselaw may inform our analysis, our decision must ultimately take account of the unique structure of the Montana Constitution and, in particular, the coordinate, overlapping, and redundant guarantees of Article II.

¶135   In the present case, therefore, the fundamental right to just compensation to the full extent of the loss for a taking or damaging of private property must be interpreted mindful of other pertinent rights in the Montana Constitution.  One such right is the "inalienable" right of "acquiring, possessing and protecting property."  Mont. Const. art. II, § 3.  In *City of Bozeman v. Vaniman*, 264 Mont. 76, 869 P.2d 790 (1994), we observed that "[p]rivate real property ownership is a fundamental right, Art. II, § 3, Mont. Const., and any statute which allows the government to take a person's property must be given

69

its plain interpretation, favoring the person's fundamental rights." *Vaniman*, 264 Mont. at 79, 869 P.2d at 792. We reaffirmed this principle in *McCabe Petroleum Corp. v. Easement and Right-of-Way*, 2004 MT 73, 320 Mont. 384, 87 P.3d 479, stating that "because eminent domain interferes with the fundamental right of private ownership of real property, any statute which allows a condemnor to take a person's property must be strictly construed, giving the statute its plain interpretation, but favoring the person's fundamental rights." *McCabe*, ¶ 28 (citing *Vaniman*, 264 Mont. at 79, 869 P.2d at 792). Although these two cases refer to "real property," we have never excluded other types of property—e.g., personal, intangible, and intellectual—from the principle that "any statute which allows a condemnor to take a person's property must be strictly construed, giving the statute its plain interpretation, but favoring the person's fundamental rights." Indeed, there is no basis in the constitutional text for limiting this principle to "real property," given that Article II, Section 3 recognizes the inalienable right to acquire, possess, and protect "property," not just "real property."

¶136 With this general approach in mind, I turn to the questions of whether the Ranchers possess constitutionally protected property interests and whether a part or a whole of those interests has been taken or damaged for public use.

## 2. Whether the Ranchers Possess Constitutionally Protected Property Interests

¶137 The Constitution protects, but does not create, property interests. *Seven Up Pete*, ¶ 26; *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164, 118 S. Ct. 1925, 1930 (1998). Rather, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."

70

*Monsanto*, 467 U.S. at 1001, 104 S. Ct. at 2872 (internal quotation marks omitted); *accord Seven Up Pete*, ¶ 26; *Germann*, ¶ 27. Critically, the term "property," as used in Article II, Section 29, contains only one qualifier: "[p]rivate." It is not otherwise restricted to any particular type of property. Rather, by its terms, the constitutional requirement of just compensation applies broadly to "[p]rivate property."

¶138 Notably, the term "private property," as used in the Fifth Amendment's Takings Clause, encompasses a wide variety of interests. It includes real property, personal property, and intangible property. *Huntleigh*, 525 F.3d at 1377-78. It also " 'denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it.' " *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 82 n. 6, 100 S. Ct. 2035, 2041 n. 6 (1980) (brackets in *PruneYard*) (quoting *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S. Ct. 357, 359 (1945)). Property interests "are about as diverse as the human mind can conceive," *Florida Rock Industries v. United States*, 18 F.3d 1560, 1572 n. 32 (Fed. Cir. 1994), and the Takings Clause is addressed to "every sort of interest the citizen may possess," *General Motors*, 323 U.S. at 378, 65 S. Ct. at 359.

¶139 The premise underlying these open-ended definitions of "property" is that the term is not frozen in time to the conceptions of "property" existing in 1791, but rather takes its meaning from contemporary understandings. Indeed, the Supreme Court has stated as much. *See e.g. Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1030, 112 S. Ct. 2886, 2901 (1992) (noting the Supreme Court's "traditional resort to '*existing* rules or understandings that stem from an independent source such as state law' to define the

range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments" (emphasis added)).  There is no reason to construe the term "property" in Article II, Section 29 differently.  Nothing in the text or history of this provision and its predecessor (Article III, Section 14 of the 1889 Constitution) suggests that the meaning of "property" and the rights associated with ownership are limited to the conceptions existing in 1889 or 1972.  To the contrary, given that the term is only qualified by the word "private," the reasonable conclusion is that "property" in Article II, Section 29 (as in the Fifth Amendment) takes its meaning from contemporary understandings.

¶140   The Montana Code defines "property" broadly.  It is not simply land, a fence, a car, or some office furniture.  It is anything that a person has the right to possess and use to the exclusion of others.  Section 70-1-101, MCA.  By way of example, property interests exist in "all inanimate things which are capable of appropriation or of manual delivery," "all domestic animals," "all obligations," "such products of labor or skill as the composition of an author, the goodwill of a business, trademarks, and signs," and "rights created or granted by statute."  Section 70-1-104, MCA.  Nothing in Montana property law, however, suggests that the meaning of "property" depends on arbitrarily drawn lines or rigidly constrictive tests devised by the federal courts.  The Court's adoption of such tests in *Kafka* (*see Kafka Opinion*, ¶ 46)—thereby restricting the definition of "property" under Article II, Section 29 to those interests which satisfy the standards created by courts of some other jurisdiction not accountable to Montanans—is indefensible.

¶141   In the present case, the Ranchers seek just compensation for the taking or damaging of several property interests:  "their alternative livestock business, inventory,

and equipment," which includes "fixtures," "facilities," and the alternative livestock. The State, the Sportsmen, and the Court do not dispute that these are compensable property interests; however, before proceeding to the question of whether a part or a whole of these interests has been taken or damaged for public use, I note the following considerations regarding the Ranchers' businesses. In the same way that the opportunity to pursue employment is a necessary incident to the fundamental right (under Article II, Section 3) to pursue life's basic necessities, *Wadsworth*, 275 Mont. at 299, 911 P.2d at 1172, the opportunity to operate one's business as a going concern is a necessary incident to the fundamental right (also under Article II, Section 3) to acquire, possess, and protect property. Indeed, operating one's business as a going concern is, like employment, the vehicle by which many Montanans pursue life's basic necessities; and the property interests associated with a going business are, therefore, entitled to the highest level of protection by this Court.

### 3. Whether a Part or a Whole of the Ranchers' Property Interests has been Taken or Damaged for Public Use

¶142   Article II, Section 29 guarantees just compensation to the full extent of the loss where private property has been "taken or damaged for public use." The Ranchers do not contend that the "public use" requirement has not been met; thus, the only question here is whether their property has been "taken or damaged."

¶143   The Court is of the view that Article II, Section 29 applies only to eminent domain proceedings and inverse condemnation actions arising out of, or related to, a direct appropriation of property. *See* Opinion, ¶¶ 67-69. The Court asserts that Article II,

Section 29 provides no protection whatsoever against property loss or damage occasioned by government regulation. Opinion, ¶ 69. This, of course, moots the difficult question of how far is "too far" under Article II, Section 29. *Cf. Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922) ("The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."). Apparently now, no regulation ever goes "too far" under the Montana Constitution.

¶144 As noted, I strenuously disagree with this emasculation of Article II, Section 29. Tellingly, the Court's corresponding analysis is "as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death." Abraham Lincoln, Sixth Debate with Stephen A. Douglas, at Quincy, Illinois (Oct. 13, 1858), in *The Collected Works of Abraham Lincoln* vol. 3, 245, 279 (Roy P. Basler ed., Rutgers University Press 1953).

¶145 First, the Court misstates that Article II, Section 29 was adopted "verbatim" from the 1889 Constitution.[3] Opinion, ¶ 65. The Court then cites *Less v. City of Butte*, 28 Mont. 27, 72 P. 140 (1903), and *Knight v. City of Billings*, 197 Mont. 165, 642 P.2d 141 (1982), for the proposition that "the 'or damaged' language of the provision has been

---

[3] The word "verbatim" means "following the original word for word." *Webster's New World College Dictionary* 1587 (4th ed., Wiley 2002). Article III, Section 14 (1889) states: "Private property shall not be taken or damaged for public use without just compensation having been first made to or paid into court for the owner." Article II, Section 29 (1972) states (with italics representing language not contained in Article III, Section 14): "Private property shall not be taken or damaged for public use without just compensation *to the full extent of the loss* having been first made to or paid into court for the owner. *In the event of litigation, just compensation shall include necessary expenses of litigation to be awarded by the court when the private property owner prevails.*"

interpreted to apply to eminent domain proceedings, including inverse condemnation proceedings, where private property is taken or damaged for public use." Opinion, ¶¶ 65-67. Of course, this proposition does not establish that the "or damaged" language applies *only* to those contexts. Neither *Less* nor *Knight* involved a regulation of property, and neither case confined the "or damaged" clause in the way the Court now declares. For that matter, the Court's reliance on *Knight* is highly questionable given our statement that our "holding is limited to the situation here, where a physical taking across the street occurred." *Knight*, 197 Mont. at 174, 642 P.2d at 146. In any event, *Less* and *Knight* simply do not stand for the Court's assertion that Article II, Section 29 does not recognize a taking or damaging of property caused by government regulation.

¶146 Next, the Court cites *Customer Co. v. City of Sacramento*, 895 P.2d 900 (Cal. 1995), for the proposition that California's "or damaged" clause does not apply beyond the ambit of eminent domain and public improvements. Opinion, ¶ 68. *Customer Co.*, however, did not involve a claim based on government regulation of property. Rather, it involved a claim that just compensation is owed when public employees (e.g., law enforcement officers), in the pursuit of their public duties, cause damage to private property. The court held that the public entities involved may be held liable, if at all, only in a tort action, not an inverse condemnation action. *Customer Co.*, 895 P.2d at 901. *Customer Co.* is also inapposite.

¶147 Moreover, assuming, as does the Court, that the high courts of sister states may dictate the meaning of the Montana Constitution, I note that the North Dakota Supreme Court has applied Article I, Section 16 of the North Dakota Constitution to a regulatory

taking or damaging claim.  *See Wild Rice River Estates, Inc. v. City of Fargo*, 705

N.W.2d 850 (N.D. 2005).  This provision, like Article II, Section 29, states that "[p]rivate

property shall not be taken or damaged for public use without just compensation having

been first made to, or paid into court for the owner."  N.D. Const. art. I, § 16.  Notably,

the North Dakota Supreme Court has said that this constitutional provision "is broader in

some respects than its federal counterpart because the state provision was intended to

secure to owners, not only the possession of property, but also those rights which render

possession valuable."  *Wild Rice*, ¶ 16 (internal quotation marks omitted).  Likewise,

Article I, Section 16 of the Washington Constitution states that "[n]o private property

shall be taken or damaged for public or private use without just compensation having

been first made, or paid into court for the owner."  In *Manufactured Housing*

*Communities v. State*, 13 P.3d 183 (Wash. 2000), the Washington Supreme Court

observed that "a regulation" can violate Article I, Section 16 when it "effects a total

taking of all economically viable use of one's property," "has resulted in an actual

physical invasion upon one's property," "destroys one or more of the fundamental

attributes of ownership (the right to possess, exclude other and to dispose of property),"

or "[was] employed to enhance the value of publicly held property."  *Manufactured*

*Housing*, 13 P.3d at 187.  Similarly, in Alaska,

> Article I, section 18 of the Alaska Constitution provides that "[p]rivate
> property shall not be taken or damaged for public use without just
> compensation." Property owners enjoy broader protection under the Alaska
> Constitution than under the Fifth Amendment of the United States
> Constitution.

*R & Y, Inc. v. Municipality of Anchorage*, 34 P.3d 289, 293 (Alaska 2001).  The Alaska

Supreme Court has applied this "broader protection" to government regulations. *See*

*R & Y*, 34 P.3d at 293-96.

¶148    The Court evidently overlooks these cases (and perhaps others), accusing this Dissent of not citing "a single case" for the proposition that the "or damaged" language is "intended to provide any greater protections in the regulatory taking context than does the Fifth Amendment to the U.S. Constitution, or that it applies to anything other than the consequential damages to the property of persons affected by a physical condemnation, or similar actions, initiated by the State." Opinion, ¶ 69.

¶149    Lastly, the Court turns to the actual language of Article II, Section 29. The Court asserts that neither the 1889 nor the 1972 Constitutions "evince any intent that [the "or damaged" language of Article II, Section 29] apply to regulatory takings or damages resulting therefrom." Opinion, ¶ 69. There are two obvious problems with this assertion. First, as explained above, the language of Article II, Section 29 must be interpreted so as to give effect to Article II's coordinate, overlapping, and redundant guarantees—a point the Court utterly fails to address. Second, the Court's assertion could also be made about the Fifth Amendment's Takings Clause, which simply states: "nor shall private property be taken for public use, without just compensation." There is no more reason to conclude that this language encompasses regulatory takings than there is to conclude that the pertinent language of Article II, Section 29 ("Private property shall not be taken or damaged for public use without just compensation.") encompasses regulatory takings. Yet, the former does encompass regulatory takings, *see Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646 (1978), as the Court concedes, *see* Opinion, ¶ 74.

If Justice Holmes can perceive in the language of the Fifth Amendment's Takings Clause the notion that "if regulation goes too far it will be recognized as a taking," *Mahon*, 260 U.S. at 415, 43 S. Ct. at 160, we can reasonably conclude that he would perceive the same principle in the language of Article II, Section 29, which is identical in all pertinent respects aside from the additional words "or damaged."

¶150   As a final point, the Court reasons that because Article II, Section 29 states that private property shall not be taken or damaged for public use without just compensation "having been first made to or paid into court for the owner," Article II, Section 29 "obviously" contemplates only a condemnation of property. Opinion, ¶ 69. I disagree for the simple reason that the Court's interpretation is inconsistent with the "or damaged" clause and leads to an absurd result. The clause relied on by the Court ("having been first made to or paid into court for the owner") requires the State to pay just compensation "to the full extent of the loss" in advance. Certainly, this may be done when the State sets out to "take" property. But it is pure folly to suggest that the State may do the same with respect to "damaging" property. How could it possibly be known, in advance, all of the properties that will be damaged during the course of a public works project and what "the full extent of the loss" will be? "Obviously," it cannot be known. The Court creates an absurd result by applying the advance-payment clause to the damaging clause. *Cf. In re Marriage of McMichael*, 2006 MT 237, ¶ 14, 333 Mont. 517, ¶ 14, 143 P.3d 439, ¶ 14 ("We interpret a statute to give effect to its purpose and to avoid absurd results.").

¶151 In sum, there is nothing in the text of Article II, Section 29 limiting its applicability in the way the Court does today. Article II, Section 29 states:

> Private property shall not be taken or damaged for public use
> without just compensation to the full extent of the loss having been first
> made to or paid into court for the owner. In the event of litigation, just
> compensation shall include necessary expenses of litigation to be awarded
> by the court when the private property owner prevails.

If the State passes a regulation permitting a telecommunications company to run a fiber optic cable through private lands, there is no textual basis for concluding that the property owners cannot prevail under Article II, Section 29 on a claim that their property has been "taken or damaged." *Cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164 (1982). If the State passes a regulation completely depriving a property owner of all economically beneficial use of her property, there is no textual basis for concluding that the property owner cannot prevail under Article II, Section 29 on a claim that her property has been "taken or damaged." *Cf. Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886 (1992). If the State passes a regulation destroying one or more of the fundamental attributes of ownership, there is no textual basis for concluding that the property owner cannot prevail under Article II, Section 29 on a claim that her property has been "taken or damaged." *Cf. Manufactured Housing Communities v. State*, 13 P.3d 183, 187 (Wash. 2000).

¶152 The Court's contrary interpretation, limiting the reach of Article II, Section 29 to direct appropriations, amounts to the improper insertion of language into the provision. *Cf.* § 1-2-101, MCA ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted."). Article II, Section 29 does not in any way describe, define, or circumscribe the ways in which private property may be

79

"taken or damaged." It simply states, "Private property shall not be taken or damaged for public use . . . ." Clearly, property is "taken" for public use in an eminent domain proceeding. Property may also be "damaged" as a result of a public works project. But I reject the Court's assertion that property cannot be "taken or damaged" for public use by government regulation. Nothing in the text of Article II, Section 29 requires such a construction. In fact, given that the Fifth Amendment's Takings Clause reaches regulatory takings, and given that Article II, Section 29 is facially broader than the Fifth Amendment, the logical conclusion is that Article II, Section 29 also reaches regulatory takings (and damagings).

¶153 The notion of construing Article II, Section 29 more broadly than its federal counterpart is well-established. In *Less v. City of Butte*, 28 Mont. 27, 72 P. 140 (1903), this Court stated:

> Constitutions which provide that "private property shall not be *taken* for public use without just compensation" are but declaratory of the common law, and contemplate the physical taking of property only. Under constitutions which provide that property shall not be "taken or damaged" it is universally held that "it is not necessary that there be any physical invasion of the individual's property for public use to entitle him to compensation."

*Less*, 28 Mont. at 32, 72 P. at 141. The *Less* Court's restrictive interpretation of the Fifth Amendment's Takings Clause as contemplating only a "physical taking" is clearly no longer valid. *See e.g. Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646 (1978) (recognizing regulatory takings under the Fifth Amendment). That, however, is not the point. Rather, the point is that the damaging clause was intended, from its inception, to provide a broader range of protection than the Fifth Amendment, as

80

interpreted in extant jurisprudence, provides. It is untenable to suggest, as the Court does today, that while the reach of the Fifth Amendment's Takings Clause (ratified in 1791) grew broader over time to accommodate changing needs, the reach of Article III, Section 14 (1889) and, subsequently, Article II, Section 29 (1972) remained frozen in time.

¶154 In support of this originalist approach to constitutional interpretation, the Court relies on the fact that the delegates' discussion of Article II, Section 29 during the 1972 Constitutional Convention centered primarily on taking property for highway purposes. Opinion, ¶ 67. This discussion, however, is inapposite. The delegates were considering a motion by Delegate Davis to strike the clause "having been first made to or paid into court for the owner." *See* Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, pp. 1826-27. (Notably, Delegate Davis pointed out that "I don't think that you can make a determination of what the full extent of the loss is until after the construction takes place." Verbatim Transcript, p. 1826.) But the delegates did not even discuss government regulation of property, let alone express the view that Article II, Section 29 should not apply to government regulations. Their discussion, therefore, does not lend one shred of support to the Court's proposition that Article II, Section 29 does not apply to regulatory cases.

¶155 In this connection, the Convention transcripts read as a whole support the contrary view that Montana property owners are protected against uncompensated regulatory infringements on their property rights. One cannot read the transcripts of the debates without recognizing that Montana's Constitution is a progressive constitution. The delegates wrote into our Constitution fundamental rights—protections, really—to protect

81

citizens from the government's inexorable reach into their lives and property. Article II, Section 3 is an apt example. It guarantees to every person "certain inalienable rights," including "the right to a clean and healthful environment and the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and seeking their safety, health and happiness in all lawful ways." Recognition of many of these rights as inalienable is unique to Montana's Constitution.

¶156 Article II, Section 4 recognizes—again, uniquely—that the "dignity" of the human being is "inviolable." This section also requires the government to treat persons equally under the law, and it prohibits discrimination. Article II, Section 7 states, more broadly than the First Amendment, that every person "shall be free to speak or publish whatever he will on any subject." Article II, Sections 8 and 9 guarantee the public's right to participate in governmental decision-making and the right of each person to examine documents and observe the deliberations of all public bodies and agencies. Neither of these rights is protected by the federal constitution.

¶157 The Montana Constitution, unlike its federal counterpart, explicitly protects the right of individual privacy at Article II, Section 10. Montanans enjoy a broader protection of the right to bear arms under Article II, Section 12 than they do under the Second Amendment. The right to vote is explicitly and broadly protected by Article II, Section 13. Article II, Section 15 grants persons under the age of 18 all of the fundamental rights in Article II—a guarantee not contained in the federal constitution.

Article II, Section 16 requires that every person have access to the courts and a speedy remedy for every injury of person, property, or character.

¶158 Article II, Section 18 declares that the State and its governmental subdivisions are subject to suit (i.e., that sovereign immunity is abrogated) except as specifically provided by law. Article II, Section 19 states that the privilege of habeas corpus shall "never" be suspended—a right not provided by the federal constitution. Certain clauses of Article II, Sections 23, 24, 25, and 26 provide guarantees to a greater extent than like provisions of the federal constitution. And Article II, Section 29 is textually broader than the Fifth Amendment's Takings Clause.

¶159 The delegates intended the Declaration of Rights " 'to stand on its own footing and . . . provide individuals with fundamental rights and protections far broader than those available through the federal system' " in order " 'to meet the changing circumstances of contemporary life.' " *Dorwart v. Caraway*, 2002 MT 240, ¶ 94, 312 Mont. 1, ¶ 94, 58 P.3d 128, ¶ 94 (Nelson & Trieweiler, specially concurring) (citation omitted). This intent to give the Declaration of Rights "teeth" could not be more apparent than in the delegates' adoption of another fundamental right, Article II, Section 34. Although this provision guarantees unenumerated rights, and Article II, Section 29's protections are enumerated, the intention of the Bill of Rights Committee is still pertinent. The Committee considered Section 34 to be "a crucial part of any effort to revitalize the state government's approach to civil liberties questions" and "the source of innovative judicial activity in the civil liberties field." Montana Constitutional Convention, Comments on the Bill of Rights Committee Proposal, February 22, 1972, p. 645.

¶160 Yet, against this backdrop of broader fundamental rights, the Court today eviscerates the protections of Article II, Section 29 by declaring this section to provide no more protection than does the Fifth Amendment. Opinion, ¶¶ 69, 74. To make matters worse, the Court chooses to march lockstep with the confused muddle of Fifth Amendment jurisprudence.[4] I simply cannot abide the Court's decision. It ignores the plain language of Article II, Section 29. It ignores the interconnectedness of the Article II rights—in particular here, the right to acquire, possess, and protect property (Article II, Section 3) and the right to just compensation for a taking or damaging of that property (Article II, Section 29). It ignores the broad property rights statutorily defined in §§ 70-1-101 and -104, MCA. And it ignores the overriding theme and fabric of the Declaration of Rights: to protect the fundamental rights of Montanans irrespective of how those rights may be interpreted under like provisions of the federal constitution and to "revitalize" the government's approach to civil liberties.

---

[4] Federal regulatory takings jurisprudence has been described as a "doctrinal muddle" lacking "theoretical coherence," Bradley C. Karkkainen, *The Police Power Revisited: Phantom Incorporation and the Roots of the Takings "Muddle,"* 90 Minn. L. Rev. 826, 827, 828 (2006), "a confused body of law containing contradictory principles and standards," John D. Echeverria & Sharon Dennis, *The Takings Issue and the Due Process Clause: A Way Out of a Doctrinal Confusion*, 17 Vt. L. Rev. 695, 696 (1993), a composite of "ad hoc determinations rather than principled resolutions," Carol M. Rose, Mahon *Reconstructed: Why the Takings Issue is Still a Muddle*, 57 S. Cal. L. Rev. 561, 562 (1984), and an area of law whose "predominant characteristic" is "a welter of confusing and apparently incompatible results," Joseph L. Sax, *Takings and the Police Power*, 74 Yale L. J. 36 (1964). It has been said that "[e]ven the wisest lawyers would have to acknowledge great uncertainty about the scope of [the Supreme Court's] takings jurisprudence." *Nollan v. California Coastal Com'n*, 483 U.S. 825, 866, 107 S. Ct. 3141, 3164 (1987) (Stevens & Blackmun, JJ., dissenting). The Supreme Court itself has acknowledged that its regulatory takings jurisprudence "cannot be characterized as unified." *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082. *See also Kafka Dissent*, ¶¶ 148-151 (discussing the conflation of takings and substantive due process principles).

¶161 Long ago, when Montana first joined the Union, the citizens of this state were unwilling to leave their property rights to the whims of the property-related provisions of the federal constitution and the Supreme Court's interpretations of those provisions. Rather, they included in our Constitution an explicit assurance that private property would not be taken or damaged for public use without just compensation. Mont. Const. art. III, § 14 (1889). This provision was carried forward into the 1972 Montana Constitution, with the additional requirement that compensation be provided "to the full extent of the loss"—language which clarifies unequivocally that whether property was taken or damaged depends not on what the government got, but on what the property owner lost. Mont. Const. art. II, § 29 (1972).

¶162 It is this Court's responsibility—indeed, its obligation—to acknowledge Article II, Section 29 as the free-standing provision it is and not relegate it to the status of a mere constitutional redundancy. We previously recognized this obligation in *Gas Products Co. v. Rankin*, 63 Mont. 372, 207 P. 993 (1922), when we refused to ignore our own Constitution and simply adopt the Supreme Court's holding in a closely related case:

> Were we content to accept the views expressed by the Supreme Court of the United States as the rule of property rights in this state, our task in determining the questions presented would be comparatively easy. However, the danger of establishing such a principle in this state is apparent, and although we entertain the very highest regard and respect for the decisions of the Supreme Court of the United States, we do not feel constrained to follow blindly its determinations affecting the rights of our citizens, especially in view of our own constitutional guaranties. . . .
>
> .   .   .
>
> Since the constitutionality of the act is attacked, both under the federal and state Constitution, we believe it to be our duty, irrespective of

85

> the holdings of other courts, to consider and apply the provisions of our own Constitution and general statutes thereto, and declare the rule of property for Montana.

*Gas Products*, 63 Mont. at 380-81, 388, 207 P. at 994, 996-97.

¶163 Thus, some 86 years ago, this Court announced that it would not blindly follow the determinations of the Supreme Court affecting the property rights of our citizens, and we acknowledged our duty, irrespective of the holdings of other courts, to declare the rule of property for Montana based on the provisions of our own Constitution and general statutes thereto. *Gas Products*, 63 Mont. at 380-81, 388, 207 P. at 994, 996-97. We have utterly failed in recent years to abide by this approach, choosing instead, as the Court does today, to "look[ ] to federal case law for guidance when considering takings claims brought under Article II, Section 29." Opinion, ¶ 63. As a result, the confusion and uncertainty encumbering federal regulatory takings jurisprudence (*see* ¶ 160 n. 4) have infected our own takings jurisprudence. This situation is untenable. It is long past time that we articulate appropriate standards for analysis under Article II, Section 29 and quit allowing federal court decisions to dictate the meaning and substance of Montana's Constitution.

¶164 Construing Article II, Section 29 in light of the coordinate guarantees in Article II, I conclude that this provision applies to situations in which property is taken or damaged by virtue of government regulation. I further conclude that this provision affords broader protections than the Fifth Amendment's Takings Clause. Based on these conclusions and the foregoing discussion, I now address whether a part or a whole of the Ranchers' property interests has been taken or damaged, entitling them to just compensation to the

full extent of the loss pursuant to Article II, Section 29. Given the impact of I-143 on the alternative livestock industry—outright obliteration—I consider this to be a relatively easy question to answer.

¶165   I-143 forced the Ranchers out of business, as it was intended to do. Consequently, the goodwill and going-concern value of the Ranchers' businesses have been totally destroyed. *See Kafka Dissent*, ¶¶ 197-211. In this respect, I-143's effect is dramatic. For all intents and purposes, the Ranchers have been "ousted" from their domain vis-à-vis the goodwill and going-concern value of their businesses. *Cf. Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082 ("Each [of our regulatory takings inquiries] aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain."). I would hold that this constitutes not merely a damaging of their businesses, but an outright taking of them.

¶166   The Court reasons that "businesses themselves cannot be taken unless the government physically condemns those businesses and runs them itself." Opinion, ¶ 89 (citing *Kafka*, ¶¶ 55-63). This reasoning is lifted, almost verbatim, from the Sportsmen's appellate brief, where they argue:

> The cases in which courts have determined whether "businesses" were even compensable property involve physical appropriation of the property with governmental intent to itself take over the operation of the business it appropriated. *See Kimball Laundry Co. v. United States*, 335 U.S. 1, 12 (1949); *United States v. 0.88 Acres*, 760 F. Supp. 210 (W.D. Mich 1987). . . .
>      The *0.88 Acres* court was emphatic that even where the business property was physically appropriated, "damages for the loss of goodwill or loss of the going-concern value of a business are not compensable unless the government has condemned the business property with the intention of carrying on the business." *Id.* emphasis added; *See also Kimball Laundry*,

335 U.S. at 12 (where the government appropriated a laundry and ran it as a laundry during World War II, compensation for the business was appropriate).

As I explained in *Kafka*, however, this interpretation of *Kimball Laundry* is erroneous. *See Kafka Dissent*, ¶¶ 213-214. Moreover, it is illogical. The rule which the Court and the Sportsmen have completely distorted is that when a business is unable to transfer its goodwill and going-concern value to another location (e.g., because the government has taken over the business, or because transfer is prohibited), then compensation is required. *See Kafka Dissent*, ¶¶ 208-210.

¶167 As for the Ranchers' inventory, equipment, fixtures, and facilities—most of which were procured and designed for the specific purpose of alternative livestock ranching and, thus, have little or no salvage value—I would hold that the Ranchers are entitled to just compensation for a damaging of property. Likewise, the Court points out that the Ranchers' alternative livestock lost roughly 95% of its value as a result of I-143. *See* Opinion, ¶ 90 n. 6. Even if the Ranchers have not been deprived of "all" economically viable use of the livestock—a questionable proposition, which the Court asserts in ¶ 80— I would hold that they are entitled to compensation "to the full extent of the loss," i.e., for the 95% devaluation. Mont. Const. art. II, § 29.

¶168 In rejecting the Ranchers' claim with respect to their alternative livestock, the Court asserts that although the Ranchers' herds were disease free, the Ranchers "knew that their alternative livestock carried with them an inherent danger of spreading CWD which could never be eliminated and which could prove uncontrollable if it made its way into the genetic make-up of the native wildlife populations." Opinion, ¶ 98. The Court

thus concludes that any investment-backed expectations the Ranchers had in their alternative livestock were unreasonable.

¶169   The irony in the Court's reasoning, which the Ranchers point out in their briefs, is that they would have been better off (as it turns out) if their alternative livestock had contracted CWD.  *See* 9 C.F.R. § 55.2 ("The Administrator is authorized to pay for the purchase and destruction of CWD positive animals, CWD exposed animals, and CWD suspect animals.").   In other words, what the Court fails to recognize is that if the Ranchers should have known that their livestock could contract CWD, thus necessitating destruction, then they had investment-backed expectations in receiving at least *something* for the livestock.  As it is, however, they are receiving nothing because their herds are healthy.  That point aside, to the extent Article II, Section 29 requires us to consider the Ranchers' investment-backed expectations, I do not agree with the Court that those expectations were unreasonable. *See Kafka Dissent*, ¶¶ 230-238.

¶170   The Court criticizes my analysis as failing to explain how Article II, Section 29 would apply in less-dramatic instances of government regulation of property.  Opinion, ¶ 71.  It is not necessary, however, to articulate a rule applicable to all possible cases.  As the Supreme Court has stated, most regulatory takings require a case-by-case approach.  In any event, we cannot refuse to find a taking or damaging of property under Article II, Section 29 on the ground that there may be borderline cases in which we will have to engage in a more complex balancing analysis.  *Cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436, 102 S. Ct. 3164, 3176 (1982) ("[T]his Court has not declined to apply a *per se* rule simply because a court must, at the boundary of the rule,

apply the rule of reason and engage in a more complex balancing analysis."). The Court's criticism is also incongruous, given that the Court refuses to develop any jurisprudence under Article II, Section 29, choosing instead to eviscerate the provision and march lockstep with the federal courts' pronouncements under the Fifth Amendment. Nevertheless, I note that we purported to adopt and apply a test in *Knight v. City of Billings*, 197 Mont. 165, 642 P.2d 141 (1982), for determining when property has been damaged: " 'whether the interference is sufficiently direct, sufficiently peculiar, and of sufficient magnitude to cause us to conclude that fairness and justice, as between the State and the citizen, requires the burden imposed to be borne by the public and not by the individual alone.' " *See Knight*, 197 Mont. at 173, 642 P.2d at 145 (quoting *Batten v. United States*, 306 F.2d 580, 587 (10th Cir. 1962) (Murrah, C.J., dissenting)).

¶171   Here, as discussed earlier in this Dissent, the Sportsmen "represent the voices of thousands of Montana men and women who believe I-143 is vital to the protection of Montana's wildlife and to the tradition of fair chase hunting." According to the Sportsmen, "I-143 was designed and enacted to address very serious dangers to Montana's wildlife and fair chase hunting heritage." Based on the principle that the State may not force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole, I would hold that the costs of achieving the Sportsmen's goals for all Montanans must be borne by the public, not disproportionately placed on the shoulders of the alternative livestock ranchers.

## IV.  CONCLUSION

90

¶172 In conclusion, I disagree with the Court's analysis of the Ranchers' claims under the Fifth Amendment for the reasons stated in my *Kafka* dissent. I also disagree with the Court's analysis of the Ranchers' claims under Article II, Section 29 for the reasons set forth above.

¶173 As to the latter, I am flabbergasted that this Court, by means of a cramped originalist approach, holds that the rights and protections afforded by the Montana Constitution's textually distinct and broader eminent domain provision are *less* protective than those afforded by the federal constitution. This holding not only flies in the face of the plain language of Article II, Section 29, but also flouts this Court's heretofore dedication to interpret the coordinate, overlapping, and redundant guarantees of the Declaration of Rights together so as to give effect not only to the letter of the constitutional language, but also to the spirit of Montana's highest law.

¶174 Though federal jurisprudence may dictate the minimum protections of property rights, Article II, Section 29 constitutes a separate and enforceable constitutional right. Creating a body of law grounded in Article II, Section 29 is necessitated not only by its broader language and its inclusion in the Declaration of Rights, but also by the fact that federal caselaw contains doctrines and precedents that are antithetical to Montanans' property interests—the most notable of which, in recent memory, is *Kelo v. City of New London*, 545 U.S. 469, 125 S. Ct. 2655 (2005), a case clearly of concern to Montanans as evidenced by the legislative responses thereto. *See* Laws of Montana, 2007, Ch. 512 (amending various statutes to provide that private property may not be acquired by eminent domain for the purpose of increasing tax revenue).

¶175 It is said that hard cases make bad law. This case proves the rule. In "carefully crafting" I-143 to end-run the just-compensation requirement of Article II, Section 29, the Sportsmen sold the Initiative to 204,282 Montana voters in a classic bait and switch: promote one product with the ulterior goal of selling something entirely different. Wrapped in the hyperbole of "ethical fair chase hunting" and protecting Montana's feral ungulates from disease, hybridization, and privatization, the Sportsmen depicted the alternative livestock ranchers as bad people conducting an offensive business injurious to these higher principles. Yet, the Sportsmen's intent with I-143 was not to address the concerns argued to the voters. Rather, it was to drive a subjectively reprehensible industry out of existence by denying the businesses in that industry the ability to charge for their principle service.

¶176 While it is important to acknowledge I-143 as the patent fraud that it was, this, of course, is not the critical issue here. Likewise, for the State to concede that it promoted and enabled the alternative livestock industry for some 83 years prior to the passage of I-143, but in the next breath condemn the industry as an offensive and harmful public nuisance in which the Ranchers had no compensable property interests, is hypocrisy of the highest magnitude. Yet, that too is water over the dam. Rather, the point to be made in this case and in *Kafka* is that if the voters want to vote an "offensive" industry out of existence, so be it. But they need to understand (as they did not here) that there is cost to doing so, and Article II, Section 29 guarantees payment regardless of whether the business owners are perceived as bad people. In other words, the voters must understand that there is fundamental constitutional principle at stake: If the public, through its

92

government, takes or damages a person's private property for the public's use or perceived benefit, then the public, through its taxpayers, must pay just compensation to that person.

¶177  No doubt the Court's decision here and in *Kafka* will be hailed as the final nail in the alternative livestock ranchers' coffin.  Unfortunately, while the Court has provided the coup de grâce to what a majority of the voters perceived as a noxious and offensive industry, the fallout from these two decisions will not be so limited.  This Court has now cabined the scope of Article II, Section 29 beyond its historical underpinnings and its plain language.  In so doing, the Court has diminished the right of Montanans under Article II, Section 3 to acquire, possess, and protect property.  The Court has also reinforced the government's inexorable reach into other Montana businesses.

¶178  Worse still, our decisions will encourage other groups to promote and sell similar bait-and-switch initiatives which, if "carefully crafted," may effectively nullify other fundamental rights.  This result is abhorrent.  Today, it is the right to be paid just compensation when the State takes or damages private property.  But given the Court's decision to ratify I-143's blatant attempt to end-run this right, all of the other Article II rights are equally at risk.  The result this Court has achieved in this case and in *Kafka* is not worth the ultimate cost to Montana's Constitution.

¶179  I dissent.

/S/ JAMES C. NELSON

Judge Wm. Nels Swandal, sitting for Justice Brian Morris, joins the Dissent of Justice James C. Nelson.

/S/ WM. NELS SWANDAL

Judge Wm. Nels Swandal, dissenting.

¶180 I concur with Justice Nelson's dissent. Because of the majority's circuitous reasoning, its disdain for private property rights, its endorsement of unprincipled and unfettered government action, which will result in the total loss of value, without compensation, of some of the property at issue, and its disavowal of the plain language of the Montana Constitution, I offer additional comments. Justice Nelson exhaustively discussed the applicable law, and I will not repeat that here. I would find that a taking occurred under both the Fifth Amendment to the United States Constitution and Article II, Section 29 of the Montana Constitution in this case and in *Kafka v. Montana Dept. of Fish, Wildlife and Parks*, 2008 MT 460, ___ Mont. ___, ___ P.3d ___.

¶181 In 1972, the distinction between real property and personal property was well known to the constitutional conventioneers. Article II, Section 29 says, "Private property shall not be taken or damaged for public use without just compensation . . . ." It does not say "real property" or "land." It does not exclude businesses and all their accoutrements. It does not say that a physical invasion has to occur for damage or a taking to occur. The 1972 Constitutional Convention left the language from the 1889 Constitution intact, foreclosing the possibility of a lockstep march with the federal government. The majority can offer no textual basis in the Montana Constitution for providing less protection to

personal, business, and intangible property than for real property. Private property is private property.

¶182 The majority does claim that it is just too hard to determine damages in certain types of property. Apparently, trial judges will no longer be burdened with giving the instruction that simply because damages are hard to determine does not mean that none exist and should not be awarded. The majority also apparently believes that juries are not capable of weighing factual issues in takings cases. Thomas Jefferson said, "I consider [trial by jury] as the only anchor yet imagined by man, by which a government can be held to the principles of its constitution."[1] His statement was prescient. In this case, the majority has denied appellants the opportunity to prove their damages to a jury and has sanctioned a governmental violation of constitutional principles.

¶183 There is no justification under the Montana Constitution for a different set of rules for regulatory takings versus an actual occupation of property. The State, when it takes property of any kind, should pay; the more it takes the more it should pay. The takings provision in the Montana Constitution prevents abuse by the State of its eminent domain power and provides protection for private property rights. Freedom and prosperity suffer without such protections. Unfortunately for all citizens of Montana, this Court has ignored its obligations and has abandoned any effort to match the benefits to the State of this taking with the burden imposed on the businesses.

---

[1] *The Writings of Thomas Jefferson*, vol. 3, 71 (Washington ed. 1861) (Letter to Thomas Paine, July 11, 1789).

¶184   For that matter, it is legitimate to ask what benefit was received.  The State, in its argument, asserted that this was a legitimate exercise of the State's "police power," a term often used in constitutional discourse but a term that does not appear in the constitution.  As written and passed, I-143 did not benefit the State.  The State claims that some people in Montana were offended by fee hunting.  Yet, it is remarkable that their only concern was the exchange of money, not the killing.  In reviewing the Montana Constitution, I did not find a constitutional right not to be offended.  It must be there because it is the only hook the majority can hang their hat on as suggesting a benefit.  I-143 did not ban the existence of elk farms; it did not ban the shooting of elk within an elk farm; it did not change the amount of regulation; it did nothing to control disease or lessen contact between captive and wild animals; and it did nothing to preserve the State's hunting heritage.

¶185   What I-143 did was prohibit fee hunting.  It completely destroyed the value of the businesses, which includes the license and other intangible assets, and about 90% of the value of the livestock.  This is after, as aptly described by Justice Nelson, the State facilitated and encouraged elk farms and the spending of hundreds of thousands of dollars in specialized capital expenditures.  Considering that game farms had been sanctioned in this state for over 80 years, to claim now that these appellants had no reasonable expectation they would be allowed to operate their businesses for profit is offensive to any modicum of common sense.  Apparently, the power to regulate, in the majority's view, equals the power to destroy.  I do not believe this is what the constitutional conventioneers had in mind.

¶186 It is disturbing that this Court did not attempt to balance costs and benefits. The appellants in this case and in *Kafka* lost millions of dollars so some people were no longer offended. The rule from this Court: The State wins and pays nothing as long as there is a hint of benefit to the State, even if the private property owner suffers pounds of burden. Justice Holmes was worried about the use of the police power as justification when he stated: "The protection of private property in the Fifth Amendment . . . provides that it shall not be taken . . . without compensation. . . . When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922). Today's majority opinion is the type of decision he was concerned about and leads to the inescapable conclusion that, in Montana, actual benefit does not have to occur before fundamental rights are destroyed.

¶187 The Sportsmen's and the majority's assertions that I-143 served "weighty" and "vital" purposes is laughable. I-143 did not directly address any of the concerns that led to its passage. It was deceptive and a charade by design—deception and fraud embraced by this Court.

¶188 Ayn Rand correctly observed that the right to life is the source of all rights—and the right to property is their only implementation. Without property rights, no other rights are possible. These principles are embodied in the Montana Constitution in Article II, Sections 3 and 29. I invite the majority to read them. The fundamental rights to acquire, possess, and protect property are not even given lip service by this Court. Under

the majority's opinion, the State suffers no consequences for the exercise of coercive and unreasonable power in destroying these businesses. There is no serious effort to balance benefits and burdens. It may be too early to start asking, "Who is John Galt?"[2] but more decisions like this will seriously impact all private property and business owners in this State.

¶189 I strongly dissent from the majority opinion.

/S/ WM. NELS SWANDAL
Honorable Wm. Nels Swandal, District Judge
sitting for Justice Brian Morris

---

[2] In Ayn Rand's work *Atlas Shrugged*, the phrase becomes an expression of helplessness and despair at the current state of the novel's fictionalized world.